CIACCIO, J *
_JjOn June 15, 2006, Anthony Bell was indicted by an East Baton Rouge Parish grand jury with the first-degree murders of his wife, Erica Bell; her relatives, Leonard and Gloria Howard; Doloris McGrew; and Darlene Mills Selvage; as well as for the attempted first-degree murder of Claudia Brown, Erica Bell’s mother, all committed on May 21, 2006. The state gave notice of its intention to seek the death penalty and alleged that: defendant killed Leonard and Gloria Howard and Doloris McGrew, who were over 65 years of age; defendant killed Darlene Selvage because she was a witness to the other shootings; defendant killed Erica Bell in the course of a second degree kidnapping; and defendant had specific intent to kill multiple persons in each instance. On June 16, 2006, the district court appointed the Office of the Public Defender to represent the indigent defendant. The Office assigned attorneys Margaret Lagattuta and Greg Rome to the matter. Defense counsel appeared at thirty-five hearings and filed approximately thirty pre-trial motions. However, defendant repeatedly expressed his dissatisfaction with his representation and attempted to discharge at least one of his attorneys several times. Eventually, after several different motions, on February 28, 2008, the defendant unequivocally asserted his bright to represent himself.
Before defendant dismissed his appointed counsel, they placed his mental status at issue in separate but interrelated motions. First, on June 22, 2006, the defense asked the district court to appoint a sanity commission to determine whether the defendant was competent to proceed. Second, on July 5, 2006, the defense asked the district court to appoint experts to determine the defendant’s I.Q. in light of the Supreme Court’s determination in Atkins v. Virginia, 536 U.S. 304, 321, 122 S.Ct. 2242, 2252, 153 L.Ed.2d 335 (2002), wherein the court held the Eighth Amendment prohibits the execution of mentally retarded offenders. Finally, on October 11, 2007, appointed counsel filed a lengthy Motion to Quash the state’s notice to seek the death penalty, claiming the defendant is mentally retarded. On February 26, 2007, the district court granted the defense’s Motion to Determine Defendant’s Competency, and after a hearing on August 30, 2007, the court found he was competent to proceed. The district court also granted the defense’s Motion to Determine Defendant’s I.Q. but declined to resolve the Atkins claim pre-trial, because the parties did not agree to leave this determination up to the court pursuant to La.C.Cr.P. 905.5.1, which states, “The jury shall try *440 the issue of mental retardation of a capital defendant during the capital sentencing hearing unless the state and the defendant agree that the issue is to be tried by the judge.”[1]
Jury selection began on March 31, 2008, and was completed on April 7, 2008. Trial commenced on April 8, 2008, after defendant’s requests to continue were denied. The state rested its ease-in-chief midday on April 11, 2008, and the defense rested that same day at approximately 6 p.m. The state had no rebuttal to defendant’s case, and closing arguments were completed by approximately 8:80 p.m. The jury |sretired to deliberate and after nearly two hours, unanimously found the defendant guilty as charged on each count.
On the morning of April 12, 2008, as the penalty phase was to begin, defendant made a request for attorneys Lagattuta and Rome to be reappointed to represent him, which the district court granted. The court then denied the defense’s motion to continue for sixty days and instead granted the defense two days, which was, subsequently, extended by this Court until April 17, 2008.[2] State v. Bell, 2008-804 (La.4/15/08), 979 So.2d 485. The penalty phase then took place on April 17, 2008. After the state’s and the defendant’s presentation of evidence and after approximately two hours of deliberation, the jury recommended defendant be sentenced to death on each of the five counts of first-degree murder. The defense thereafter sought a new trial on the basis that defendant was denied the tools necessary to present a defense, the role of standby counsel was unduly restricted at trial, the defense had new evidence of defendant’s mental retardation, and reappointed defense counsel were not given sufficient time to prepare a case in mitigation. The district court denied defense’s Motion for a New Trial.
Before he was sentenced, defendant again moved to dismiss his attorneys, which motion the district court denied. Defendant was sentenced on September 11, 2008, on counts one through five to death by lethal injection, and on count six to serve 50 years’ imprisonment at hard labor. The district court granted the defendant’s Motion to Appeal and Designate the Record and appointed the Capital Appeals Project to represent him on September 25, 2008.
Defendant now appeals his conviction and sentence of death, under La. Const, art. V, § 5(D), asserting 52 assignments of error. We will address the most significant |4of these errors in this opinion, and the remaining errors will be addressed in an unpublished appendix. After a thorough review of the law and the evidence, for the following reasons we affirm defendant’s convictions for first-degree murder and attempted first-degree murder, as well as the imposition of the death penalty.
FACTS
The sole surviving adult of the shootings, Claudia Brown, pastor of the small family church where the incident occurred, testified at the trial. On the morning of the shooting, Brown’s family church, the Ministry of Jesus Christ located at 1935 Dallas Drive, Baton Rouge, was holding service at approximately 9:00 a.m., with six adults[3] and five children[4] present. Brown *441 testified the defendant arrived at about 9:15 a.m. and asked that she yield the floor to him to address the gathering. Brown granted the request, and the defendant publicly stated he wanted Erica back and asked her to reconcile with him. When Erica refused, defendant became agitated, exited the church, and paced up and down the sidewalk, where he was visible to Brown. Out of concern, Brown sent her father, Leonard Howard, to cheek on the defendant outside. Howard returned to the service and indicated the defendant was okay.
As the service was ending and people were leaving, Brown testified there was a commotion in the outer room of the church and she heard her mother, Gloria Howard, say, “Don’t shoot me Anthony.” Brown remembered moving toward the door to see what was happening, and after Brown heard gunshots, the next thing she could remember she was lying face down on top of a baby’s car seat. Brown had been shot in the back of her head, and moments later she heard her daughter, Erica, 15say, “Anthony, can I kiss my Mama goodbye?” Brown heard the defendant give his permission, and as Erica kissed her on her cheek, she looked up slightly and saw a gun hanging down from the defendant’s hand. As the defendant and Erica were exiting the church, Brown heard the defendant say, “Come on, Erica! Let’s go! ... I told you I was going to do it!”
Five of the six adults present at the church that morning had been shot, all in the head, while Erica and her three children had been taken by the defendant in a rented, beige Nissan Maxima. Brown, the only adult to survive the shootings, could see at least one other victim from where she was positioned and was able to call out to one of the two children left on the scene to get her a cell phone. The first cell phone retrieved would not work, so the child retrieved another from one of the victims, and Brown called the police. Brown told the 911 operator Bell had shot up the church and asked for an ambulance immediately. She indicated she could see her family members on the ground not moving. The operator requested that Brown call out to see if anyone would respond, but no one responded to Brown’s calls, as she and the two children apparently were the only people alive in the church. She told the 911 operator she was covered in blood and did not know if she was shot or where she was shot and felt as though she might faint. The call abruptly ended when Brown heard noises and thought the defendant was coming back into the church. A recording of her 911 call was played for the jury.
After the police arrived, Brown told the police Anthony Bell had shot her, and she was taken to Our Lady of the Lake Medical Center, where she was treated and gave a statement to the police. Brown later had surgery to remove two fragments of a bullet from her head and neck. Brown’s statement to police at the hospital was also played for the jury. In her statement, Brown was very slow to communicate due to |r,her medical treatment but told police that Anthony Bell had come into church to ask the church to pray with him. She asked her father to go speak to him outside, where Anthony was pacing up and down the sidewalk. Further, Brown stated the defendant then came back in the church and began shooting everyone. *442 She indicated he was wearing a red, white, and blue pullover shirt and denim shorts, and after the shooting, defendant took Erica and their three children from the church.
Brown also testified at trial that her daughter Erica and the defendant were married in November of 2000, at a ceremony in which Brown herself performed. However, the couple had a tumultuous, on-again off-again relationship[5] and had recently separated. Brown testified that on the day before the shootings, Saturday, May 20, 2006, Erica and the defendant had an argument in her driveway, which ended with a police officer advising Erica to get a restraining order on the following Monday. During the trial, defendant cross-examined Brown and also called her as a witness. He emphasized inconsistencies in her various reports of the events in an attempt to prove she was lying, and he subjected her to lengthy and harassing questioning about the nature of their relationship. Brown repeatedly denied that she and the defendant ever had any sexual relationship.
A child witness, D.M., age six at the time of the shootings, also testified. She identified her videotaped forensic interview, which was played for the jury, indicated that she had been truthful during that interview, and pointed out the defendant as the man she saw shoot her mother in the church. On cross-examination, however, defendant elicited that she also looked out the window and saw him shoot Erica at the church, when in fact the shooting occurred elsewhere, and that some of the 17information she had conveyed to the forensic interviewer she had learned from television or others.
Several law enforcement officers also testified at the trial describing their roles in the investigation, their observations at each crime scene, and how the physical evidence was collected. As police arrived at the scene of the church, they made sure the scene was clear and immediately called EMS. The police found five victims, all with gunshot wounds to the head, and two unharmed children on the scene. After the police had removed the children, Claudia Brown informed the police that Anthony Bell had committed the shootings and taken her daughter, Erica, against her will. The police then advised all responding units of the suspect’s identity and to be on the lookout for the beige Nissan Maxi-ma. EMS transported Claudia Brown and Dolores Selvage to an area hospital, though Selvage later died from her wound. Six spent bullet casings that had contained bullets fired from a revolver were collected from the floor of the church.
Law enforcement officers testified that, approximately two hours after the church shooting, defendant called 911 to report that his wife Erica had committed suicide at an apartment complex on 650 North Ardenwood.[6] As police arrived at the apartment complex, defendant was seated outside, shirtless and holding his infant child. Erica Bell was found in the passenger seat of the Maxima with a gunshot wound to the head. A revolver was found held lightly in Erica’s hand, which was resting on her lap.[7] The revolver had one *443 live round in it and was later determined lato be the same weapon that was used in the church shooting.[8] A live round was also found in the defendant’s pocket, along with a lighter and a driver’s license. Photographs and video admitted into evidence and shown to the jury showed the location of Erica’s gunshot, the positioning of her body, and the manner in which she was holding the revolver. A red, white, and blue, striped shirt was also found in the parking lot of the apartments. Defendant and Erica both tested positive for gunshot residue. On cross-examination, however, the state’s forensic expert conceded upon questioning by the defendant that if Erica had shot herself in the vehicle, anyone else who was in the vehicle should also test positive for gunshot residue.
Similarly, DNA from both defendant and Erica was found on the revolver.[9] The defendant was the major contributor of DNA while Erica’s contribution was only minor. Latent fingerprints lifted from the revolver were not of sufficient quality to permit any comparison. Further, no fingerprints were recovered from the spent casings found at the church. Defendant used his cross-examination of the state’s law enforcement witnesses, and in fact re-called many of these witnesses, to impugn the investigation as cursory and careless. It was defendant’s contention that the police never fairly considered the possibility that he told them the truth, and as a result, they neglected to collect evidence that could have confirmed Erica was the shooter. In support, defendant’s sister, Anquita Trim, testified she went to the crime scene at the apartment building and watched as the police ignored potential witnesses. In addition, on cross-examination, defendant also elicited the concession from the state’s | ¡forensic experts that the physical evidence in this case could not definitely show who fired the revolver.
After the defendant was arrested at the North Ardenwood apartment complex and properly Mircmdized, he told his version of the events to Detective Robert Gann, who was on the scene and later testified at trial. According to Gann, when he asked the defendant why he shot all those people the defendant replied he was sorry and that he loved his baby. He indicated that he and his wife had been arguing since two o’clock that morning and she asked him to go to church with her. Once at church, his wife pulled out a gun . and began shooting, and the defendant unsuccessfully tried to wrestle the gun from her. After the struggle, she reloaded the gun and continued shooting. Defendant then stated his wife intended on killing her boyfriend “Chucky,” who lived at the North Arden-wood apartment complex.
Later, defendant was taken to the police annex and was again advised of his rights, this time signing a standard rights form. Detective Gann then recorded an interview with the defendant. Defendant told the detective, he was caught by Erica’s little sister having an affair, and he and Erica had been fighting throughout the past week. Defendant indicated Erica called him on the morning of the shootings, and they met at a Jack-in-the-Box restaurant before going to her family’s church together, arguing continuously. In front of ev *444 eryone at the church, the defendant started to confess things he had done two or three years in the past that Erica did not know about. According to defendant, Erica then left the church and came back in with a gun and started shooting, at which time the defendant covered his children. He also indicated that he then tried to get the gun away from Erica by grabbing the barrel with his left hand. When asked if the gun had been reloaded, defendant stated he had never said that, and the officers disagreed. Erica apparently then forced the defendant 11(land their children into the beige Maxima. Defendant also stated after dropping off their two older boys at Erica’s mother’s house, she then took him to an apartment complex where her boyfriend “Chuck” lived, but defendant did not know what she intended to do. According to the defendant, Erica was questioning him about his mistress, while in the car outside the apartment complex, and he told her the truth. Then, she told him to look out the window and, while he was looking away, she took her own life by shooting herself in the head with the revolver in her right hand. The officers and the defendant began to argue about the veracity of defendant’s story, and he then indicated he wanted to wait until his mother secured a lawyer for him. The state played a redacted recorded interview with the defendant in which he told this version of the events to police officers;[10]
Lekiedra Coleman testified she dated the defendant in the 1990s. She said she reported him to the police several times, and throughout their relationship, he broke into her apartment, destroyed her clothes, stalked her, and assaulted her. Coleman also described an • incident in which the defendant locked her in a closet and told her if he could not have her, then no one could. On cross-examination, defendant attempted to depict Coleman as an unreliable witness with a habit of making false accusations against her boyfriends, pointing out that she had called the police on a number of former boyfriends.
DISCUSSION
The interrelated questions of defendant’s competency to stand trial, competency to waive counsel and represent himself, and claim of mental retardation lie at the heart of the present appeal. The defense alleges the defendant has | nsignificant intellectual deficits, and consequently the district court erred in not considering said defects when evaluating his waiver of counsel and the assertion of his right to represent himself. The defense specifically refers the court to the recent United States Supreme Court decision of Indiana v. Edwards, 554 U.S. 164, 128 S.Ct. 2379, 171 L.Ed.2d 345 (2008), which was decided while the defendant was awaiting sentencing, and which the defense characterizes as holding that the constitutional right of self-representation does not preclude a trial court from taking realistic account of the particular defendant’s mental capacities by asking whether a defendant who seeks to conduct his own defense at trial is mentally competent to do so. From this, the defense argues that the trial court erred in treating the prior determination that defendant was competent to stand trial as dispositive of his ability to waive counsel and represent himself. In addition, the defense contends the district court erred in allowing defendant to represent himself during the Faretta hearing before the determination had been *445 made that he was competent to do so. Also, according to the defense, by prematurely permitting the defendant to represent himself at this hearing, the district court denied him the right to the assistance of counsel.
As for the validity of the defendant’s waiver of the right to appointed counsel, the defense claims first that it was equivocal because defendant vacillated and was motivated by the mistaken and paranoid belief that his attorneys were withholding documents from him. Similarly, the defense argues the waiver was not voluntary because the defendant believed he was forced to represent himself if he wanted to have access to the information that he believed was withheld. Additionally, the defense contends the district court did not adequately apprise the defendant of his rights and the inherent risks of self-representation.
The defense also contends that the district court’s handling of the waiver 112denied defendant necessary resources and prevented standby counsel from fulfilling their role. Specifically, the defense alleges he was denied state-funded investigative and expert assistance until late March and early April 2008, which was too late to be utilized in a significant way, and that the district court erred in denying his request for a continuance on this basis. The defense also contends the mitigation expert who had been working on defendant’s case ceased working when the defendant waived counsel, and, after funds were finally approved for a psychiatric expert, she did not conduct an evaluation in time for the penalty phase. Therefore, the defense contends the district court erred in refusing to grant its request for a 60-day recess between the guilt and penalty phases. The defense also alleges standby counsel were not permitted to effectively assist the defendant and that the court allowed the prosecution to take advantage of his lack of legal education and his limited intellectual functioning. The defense claims standby counsel were required to sit in the back of the courtroom and their efforts to assist him were curtailed.
Finally, the defense asserts the district court erred in not allowing the defendant to revoke his waiver of counsel and have attorney Gregory Rome (without Margaret Lagattuta) reappointed to represent him, which he requested when he struggled with cross-examining Claudia Brown. The defense characterizes the requirement of second-chair counsel in a capital trial as a mere rule of court that is neither statutorily nor constitutionally mandated. The defense concedes the defendant had no right to counsel of choice but argues he should not have been forced to accept Lagattuta, whom defendant believed to be ineffective. The threat that Lagattuta would be reappointed, according to defendant, rendered his subsequent withdrawal of the request involuntary. The defense argues that if the defendant was entitled to forego counsel altogether, then it is nonsensical to find that he could not forego the right to 11 shave one of the two attorneys represent him.

Defendant’s Waiver of the Right to Appointed Counsel

First, we will address the validity of the defendant’s waiver of counsel and the implications of recent United States Supreme Court jurisprudence. The Sixth Amendment expressly provides that an accused in a criminal trial has the right to the assistance of counsel. However, the Supreme Court in Faretta v. California, held the Sixth Amendment also “implies a right of self-representation.” 422 U.S. 806, 822, 95 S.Ct. 2525, 2534, 45 L.Ed.2d 562 (1975) The Faretta Court noted that the self-represented defendant can not later claim he was denied effective assistance by his *446 own representation. Id. at 834, 95 S.Ct. at 2541 n. 46. Certain limits have been put on the right of self-representation due to the tension between it and the express right to the assistance of counsel. Before Faretta, in Illinois v. Allen, 397 U.S. 337, 345-47, 90 S.Ct. 1057, 1062-63, 25 L.Ed.2d 353 (1970), the Court determined that the Sixth Amendment does not prohibit a court from removing a sufficiently disruptive defendant from the courtroom and continuing the trial without him.[11] Then, in McKaskle v. Wiggins, 465 U.S. 168, 104 S.Ct. 944, 79 L.Ed.2d 122 (1984), the Court held the Sixth Amendment does not prohibit a court from mandating some minimal involvement by standby counsel. Also, in Martinez v. Court of Appeal of Cal., Fourth App. Dist., 528 U.S. 152, 120 S.Ct. 684, 145 L.Ed.2d 597 (2000), the Court determined that the Sixth Amendment right to self-representation does not extend to appellate proceedings. Finally, in Indiana v. Edwards, 554 U.S. 164, 128 S.Ct. 2379, 171 L.Ed.2d 345 (2008), the Court established a new limitation: the Sixth Amendment does not prohibit the states from forcing counsel on persons who, [14although competent to stand trial, “still suffer from severe mental illness to the point where they are not competent to conduct trial proceedings by themselves.”
The defense attempts to invoke this recent limitation on the scope of the right to self-representation from Edwards to argue that the district court committed reversible error in granting defendant’s request to represent himself without considering his intellectual impairments and paranoid beliefs. We find this claim fails, in part, because Edwards authorizes, but not does not require, the states to adopt a more rigorous competency standard for mentally ill or incapacitated defendants who wish to represent themselves at trial.[12] The argument also fails because there is very little evidence in the record to suggest the defendant suffers from a significant mental impairment such that the considerations of Edwards would be appropriate, and, as discussed herein, there is significant evidence to the contrary. Therefore, even if this court were inclined to accept the Edwards invitation to construct new jurisprudence concerning an accused’s right to self-representation when the accused suffers from a significant mental defect or illness, the present case does not offer the facts on which it should be built.
In Edwards, the Court partially separated the standard for competence to waive | ^counsel from the standard for compe *447 tence to stand trial, as set forth in Dusky v. United States, 362 U.S. 402, 402, 80 S.Ct. 788, 789, 4 L.Ed.2d 824 (1960).[13] Previously, in Godinez v. Moran, 509 U.S. 389, 398, 113 S.Ct. 2680, 2686, 125 L.Ed.2d 321 (1993), the Court treated the standard to waive counsel as identical to the Dusky standard. In Godinez, the Court had found that no competence beyond that needed to stand trial was required for a mentally ill defendant to discharge his attorneys, plead guilty, and to forego the presentation of mitigating evidence. The Godinez Court explicitly rejected the claim that “a higher level of mental functioning” is required or that a self-represented defendant “must have greater powers of comprehension, judgment, and reason,” and emphasized that “the competence that is required of a defendant seeking to waive his right to counsel is the competence to waive the right, not the competence to represent himself.” Godinez, 509 U.S. 389, 399, 113 S.Ct. 2680, 2686, 125 L.Ed.2d 321. The Court further clarified:
In addition to determining that a defendant who seeks to plead guilty or waive counsel is competent, a trial court must satisfy itself that the waiver of his constitutional rights is knowing and voluntary. Parke v. Raley, 506 U.S. 20, 28-29, 113 S.Ct. 517, 523, 121 L.Ed.2d 391 (1992) (guilty plea); Faretta, supra, 422 U.S., at 835, 95 S.Ct., at 2541 (waiver of counsel). In this sense there is a “heightened” standard for pleading guilty and for waiving the right to counsel, but it is not a heightened standard of competence.
Id. at 400-401, 113 S.Ct. at 2687. The Godinez court concluded that, although the “States are free to adopt competency standards that are more elaborate than the Dusky formulation, the Due Process Clause does not impose these additional requirements.” Id. at 402, 113 S.Ct. at 2688.
In Edwards, the Court considered whether the Indiana courts were correct in | ififinding that the Sixth Amendment required them to reverse the convictions of a schizophrenic defendant, who had been restored to competency to stand trial but whose Faretta motion had been denied by the district court. The Edwards court first distinguished Godinez on the basis that Godinez’s Faretta motion was granted and Godinez pled guilty. Id. The Court then expressed concern for the dignity and apparent fairness of the proceedings considering the complexity of the problem of mental illness and the ways it could manifest itself in self-representation. Id. at 176, 128 S.Ct. at 2387. Given those concerns, the Edwards Court found the Sixth Amendment was not an obstacle to preserving the integrity of the proceedings in the rare case that involves a defendant who is competent to stand trial but too mentally ill to function without professional counsel in court:
We consequently conclude that the Constitution permits judges to take realistic account of the particular defendant’s mental capacities by asking whether a defendant who seeks to conduct his own defense at trial is mentally competent to do so. That is to say, the Constitution permits States to insist upon representation by counsel for those competent enough to stand trial under Dusky but who still suffer from severe mental illness to the point where they are not *448 competent to conduct trial proceedings by themselves.
Edwards, 554 U.S. at 177-78, 128 S.Ct. at 2387-88. Therefore, Edwards did not overrule Godinez, but clarified that Godi-nez should not be viewed as holding that the constitution prohibits the states from recognizing that a defendant, although competent to stand trial, may not necessarily be competent to represent himself due to some mental illness or defect. Edwards did not impose on courts any new competency requirements or procedures to determine if a defendant has intelligently and voluntarily waived his right to counsel.
Thus, in the instant case, the question presented is whether the waiver was valid under existing state law, which involves determining whether the defendant was |17competent to waive counsel and whether he did so knowingly and intelligently with full understanding of the risks and possible consequences. “The determination of whether there has been an intelligent waiver of right to counsel must depend, in each case, upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused.” Johnson v. Zerbst, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938). Trial courts should inquire into the accused’s age, education, and mental condition in deciding, on the totality of the circumstances, whether the accused understands the significance of the waiver. State v. Strain, 585 So.2d 540, 542 (La.1991). Further, a defendant must be made aware of the dangers and disadvantages of self-representation so that the record demonstrates “he knows what he is doing and his choice is made with his eyes open.” Faretta, 422 U.S. at 835, 95 S.Ct. at 2541 (quoting Adams v. United States ex rel. McCann, 317 U.S. 269, 279, 63 S.Ct. 236, 242, 87 L.Ed. 268 (1942)). In other words, a defendant must know the consequences of his action. City of Monroe v. Wyrick, 393 So.2d 1273, 1275 (La.1981). The assertion of the right must also be clear and unequivocal. See Faretta, 422 U.S. at 835, 95 S.Ct. at 2541; see also State v. Hegwood, 345 So.2d 1179, 1181-82 (La.1977). After reviewing the entire record, we find there is little reason to doubt the defendant in this matter clearly and unequivocally asserted his right to represent himself and did so knowingly and intelligently, although to his detriment.
In this case, the defendant filed numerous pro se motions in which he initially sought to act as co-counsel, maintaining his right to assistance of counsel, but also exercising his right to represent himself.[14] Defendant also filed motions to dismiss [1Rhis defense counsel and appoint new counsel, indicating his counsel was not giving him copies of his “case.” These pro se motions, among others,[15] were continually filed from July 27, 2007, to January 10, 2008. The district court repeatedly denied these motions and the court of appeal denied writs.
Defendant, however, ultimately enlarged upon the scope of his motions, and implicated his Sixth Amendment right to self- *449 representation, by stating at a hearing held on September 5, 2007, “I just want to secure my right to obtain everything dealing with my case that the state is in possession of, and I just want to represent myself.” The district court then engaged in a colloquy with defendant to clarify whether he wished to represent himself and also directed him to confer with defense counsel, who then stated: ‘Tour Honor, Mr. Bell has an oral motion that he’d like to represent himself in this capital case. That’s what he wanted to ask you.” However, defense counsel further explained that what the defendant wanted was to be able to speak during the trial as an attorney although he was represented. Based on defense counsel’s characterization of defendant’s oral motion, the district court correctly denied his request. The defense cites no new authority to show that a right to represent oneself and be represented at the same time has been established.
Nonetheless, the defendant persisted in filing pro se motions that intimated his Sixth Amendment right to represent himself. At a status hearing held on October 31, 2007, the district court indicated that it would set those motions for a hearing. At the hearing that followed, on November 5, 2007, the district court judge engaged in a colloquy with defendant to determine whether he wished to represent himself, after |19which he withdrew his request.[16] At that time, defendant stated he had filed the motion because he believed it would force the state and defense counsel to provide him with copies of all pertinent documents. On appeal, defendant relies on this expression of his motivation to argue that he never wished to represent himself. However, this does not capture the full state of the record, which shows the defendant continued to file pro se motions and demonstrated a strong desire to control his case and function as an attorney, until he ultimately resolved to dismiss counsel and represent himself, which decision was honored after a Faretta hearing on February 28, 2008.
The February 28, hearing was prompted by a new motion from defendant, a Motion to Dismiss Defense Counsel and Act as Pro Se Counsel filed on February 4, 2008, in which he wrote by hand: “At this time the Defendant would like to remove court appointed counsel from record and [assert] his right to self representation under La. C.Cr.P. art. 511.” At the outset of the hearing, defense counsel indicated defendant had spoken with both appointed counsel, an outside defense attorney, as well as the head public defender and that he still wished to go forward with the motion. In an exchange with the district court judge, defendant indicated that, although he still believed that important information was being withheld by counsel, this was no longer his sole motivation for asserting his right to self-representation; he also believed that appointed counsel was ineffective and, after conferring with the attorneys, he fully understood the nature of his request and the consequences of self-representation. The district court then inquired into the defendant’s age, education, ability to comprehend, read, and write, and further verified that he understood the 120charges against him, the order of trial, and the potential penalty. The court also determined that he understood the presumption of innocence and his right to *450 testify regardless of his choice to represent himself or have the assistance of counsel. Further, at this hearing the court reminded the defendant he was bound by procedural requirements and the rules of evidence and ensured he understood the limited role of standby counsel.
This colloquy sufficed to show that the defendant was well apprised of his rights and the inherent risks of self-representation, and further, that he knowingly and intelligently waived his right to appointed counsel. Although defendant emphasizes those portions of the dialogue that are favorable to his position,[17] a fair reading of its entirety does not support the defendant’s claim. During the colloquy, the court asked the defendant if his purpose in filing his motion to represent himself was to get all the copies of his ease, and the defendant responded, “in part,” but went on to say, “I want to go through with my motion to represent myself because I feel like I’m not getting the effective assistance I ... I’m required.” Further, the defendant made a number of knowing and unequivocal statements indicating his desire for self-representation, in particular:
[The court]: You either represent yourself or you have someone representing you. Do you understand that?
[Bell]: Yes, sir. I wish to go forward.
[The court]: To represent yourself?
[Bell]: Yes, sir.
[[Image here]]
121 [The court]: If you wish to represent yourself then you can do so.
[Bell]: Yes, sir. I wish to proceed with that, your honor.
[[Image here]]
[Bell]: They wouldn’t be representing me neither. I mean I would be representing myself.
[[Image here]]
[The court]: Understanding [that you face the death penalty] do you wish to proceed to represent yourself?
[Bell]: Yes, sir.
[[Image here]]
[The court]: What is your desire?
[Bell]: Self-representation.
These were not equivocal or questioning statements. Instead, the record shows that the district court did not err in determining that defendant’s desire to control the presentation of his case was clear and unequivocal, and his waiver of counsel was knowing, intelligent, free, and voluntary. When asked if he desired self-representation because he believed he still was not receiving all the copies of his case or if he truly thought he could do a better job than his appointed attorneys, defendant said, “numerous reasons, Judge — Your Honor.” Then, when asked if he felt as though he could do a better job of representing himself, defendant replied, “yes, sir.” The defendant’s dissatisfaction with appointed counsel and his desire to represent himself crystallized for a number of reasons over time, which was his decision to make. In other words, the record shows that defendant, in the language of Faretta, “wished to make [his] own defense personally.” 422 U.S. at 819, 95 S.Ct. at 2533
*451 Additionally, after defendant had been representing himself for over two 122weeks, his standby counsel filed a Motion to Reconsider Defendant’s Pro Se Motion to Dismiss Counsel, and the motion was heard seven days later. At this hearing, defendant stated, “Your Honor, if I can’t— if I can’t have my attorneys and be — be co-counsel with them, I will represent myself, and I don’t want to entertain their motion.” The court attempted to confirm once again that the defendant knew there is no right to be both represented and represent yourself, he had every right to take the stand regardless of his representation, he is not being withheld discovery that representing himself will allow him to obtain, and he has been provided or allowed to inspect every piece of evidence in the case. Defendant confirmed he understood the above, but objected to the statement that he had received all of the evidence, as there was a dispute about a certain statement and a few other items that were absent from a box the state provided to the defendant. After standby counsel and the state were heard on the motion, the court insisted the defendant articulate why he opposed their motion. The defendant stated, “Because I wouldn’t be able to — I wouldn’t be able to act as co-counsel at my trial. That’s the only reason why I’m objecting to their motion.” The court then asked what he wanted to have the ability to do as co-counsel. The defendant stated, “Talk just like my lawyer would be able to talk to witnesses, question witnesses.” The defendant then reiterated his desire to act as co-counsel if he had that right, but absent that right he stated, “I’m representing myself.” It is clear the defendant in this case desired to represent himself, and was well-apprised of the dangers and pitfalls of his venture.
As for defendant’s complaint that, before he was found competent to waive assistance of counsel, he was treated by the court as unrepresented and thereby denied effective representation, this claim is without basis in law or fact. First, there is no indication that appointed counsel were prohibited from participating in the Faretta | ^hearing on February 28. Although the district court had encouraged the defendant to argue his own pro se motion at a prior hearing as a taste of what he would experience if he dismissed his appointed attorneys, the February 28 hearing began with no such admonition and defense counsel participated. Nor did defense counsel object to the manner in which the district court conducted the proceedings until well after the court had ruled. Second, Appel v. Horn, 250 F.3d 203 (3d Cir.2001), which the defendant characterizes as supporting his claim that he was denied assistance of counsel at the Faretta hearing until the moment his motion was granted, is readily distinguishable. Although it does not merit lengthy discussion, Appel is a habeas corpus case in which it was claimed that the defendant was constructively denied counsel in violation of United States v. Cronic, 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984), before the trial court accepted the defendant’s waiver of counsel. However, counsel in Appel did not prepare or perform any investigation of any kind, and in fact did not believe that they had been appointed; and they were wholly inactive at the hearing at which Appel was found competent to waive counsel. In stark contrast, appointed counsel for the instant defendant were very active throughout their representation and, as discussed above, even filed a Motion to Reconsider Defendant’s Pro Se Motion to Dismiss Counsel while acting as standby counsel.
In accepting the defendant’s waiver, however, the district court did make an erroneous statement regarding his access as an indigent defendant to pub- *452 lie resources. At a prior hearing, the district court had warned the defendant that if he were to forego the assistance of his appointed public defenders, he would “also be giving up the resources that the State of Louisiana affords to the Office of the Public Defender, resources for investigators, resources for experts and other monetary resources that | ^you would be waiving and giving up because of your desire to represent yourself.” The court explicitly asked if the defendant understood, to which he replied, “yes, sir.” This statement went unchallenged by appointed counsel. Later, the district court again asked defendant: “Do you understand that you will be giving up the financial resources of the Office of the Public Defender in your defense?” Again, this statement went unchallenged. Thereafter, with a trial date of March 31, 2008, approaching, defendant filed a motion to continue on March 7, which was heard on March 14, 2008. At that hearing, when defendant argued that he still needed to hire experts, the district court again informed him that he had “forfeit[ed] the resources of the Office of the Public Defender.” Standby counsel remained silent but the state clarified that, as an indigent defendant, the defendant had mechanisms by which he could obtain funds for experts.[18] However, after the state argued that defendant’s [¡.¿request was too vague, defendant clari *453 fied that he wanted the revolver and casings tested for fingerprints, Claudia Brown’s medical records and X-rays to be evaluated by a medical expert, and the apartment’s surveillance video to be evaluated for evidence of tampering. At that time, the district court informed the defendant that his request was not denied but instructed him to use the assistance of standby counsel to request funds from the Office of the Public Defender for the performance of such requests. The district court reiterated this twice during voir dire and again referred defendant to standby counsel and the Office of the Public Defender. Finally, during voir dire on April 3, the Public Defender District Director provided defendant with a letter that explained how to access the funds of his office. Defendant apparently successfully navigated this procedure because, on April 10, during trial, defendant’s expert arrived and took possession of the revolver and casings for testing. It is not surprising that this expert was not then called to testify because, as noted above, these items had been meticulously wiped for DNA, pursuant to agreement of the parties. Fingerprints were unlikely to survive that process. Regardless, the district court’s initial misstatements caused little, if any, delay. Rather, it appears the majority of the delay was attributable to the defendant’s failure to follow the procedures as directed and that the desired expert testing was ultimately achieved but turned out to be valueless.
As to the defense’s argument concerning the restrictions put in place for standby counsel, the defense contends the court did not ensure the proceedings were fair and allowed the prosecutors to take advantage of the defendant’s ignorance of the law. The defense cites McKaskle v. Wiggins, 465 U.S. 168, 104 S.Ct. 944, 79 L.Ed.2d 122 (U.S.1984), for the proposition that the district court was allowed to permit standby counsel’s active participation at trial and erred by placing significant restrictions on standby counsel. In McKaskle, the defendant, who was proceeding pro se, changed his mind multiple times concerning the role of his standby counsel and tried to use their participation at trial to show his right to the presentation of his own defense was interfered with. Id. The Supreme Court held that, although several of the incidents with standby counsel were regrettable, the overall participation of standby counsel considering the defendant’s frequent changes in position regarding standby counsel’s role did not violate the defendant’s Sixth Amendment right to self-representation. Id. at 181, 104 S.Ct. at 952. The Court went on to say, “Faret-ta does not require a trial judge to permit ‘hybrid’ representation of the type [the defendant] was actually allowed.” Id. at 184, 104 S.Ct. at 953. The Court also stated, “participation by standby counsel without the defendant’s consent should not be allowed to destroy the jury’s perception that the defendant is representing himself.” Id. at 178, 104 S.Ct. at 951. In the instant case, the district court instructed the defendant and his standby counsel of the role they were to play. In particular, on March 26, 2008, in response to an oral motion for clarification of the role of standby counsel, the court stated:
the court will not allow standby counsel to erode the perception of the trier of fact that the defendant is not in full control of his case. However, the court will request standby counsel be seated nearby the defendant. I will request that they be available to answer any questions the defendant may have in regards to courtroom procedure or any other question that he deems appropriate with standby counsel. I will allow standby counsel to perform any function that the court deems is the appropriate *454 [sic] under the circumstances, so long as the conduct does not impede or impair the defendant’s ability to control the presentation of his case or erode in the eyes of the jury that he is not representing himself.
Further, according to the state, Mr. Rome frequently sat in the first row in the 1 gTeourtroom, and the defendant was never denied the chance to consult with standby counsel when he desired, and in fact met with them frequently during the trial. The court recessed the trial multiple times allowing the defendant to meet with standby counsel when he did not know the proper procedure for impeachment or when he needed instruction to procure relevant information from his witnesses. The district court was not required to allow this “hybrid” representation as the defense suggests, and did not err in its procedures concerning standby counsel. In this case, the district court made sure to preserve the image that defendant was in complete control of his case, but did not curtail the role of standby counsel to such a degree as to interfere with the defendant’s constitutional right to present a defense or his right for a reliable determination of his guilt and punishment.
Finally, at the heart of the defendant’s complaint that he was erroneously permitted to waive counsel is the claim that a mentally retarded defendant with an I.Q. in the 50s is incapable of representing himself in a multiple count capital trial. The I.Q. score is repeatedly emphasized. However, for the reasons discussed in below, the assertion that this defendant is mentally retarded with an I.Q. score in the mentally retarded range is unfounded.

Defendant’s Claim of Mental Retardation

The defense claims the defendant is mentally retarded and therefore exempt from capital punishment under Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), and La.C.Cr.P. art. 905.5.1(A).[19] The defense alleges defendant’s I.Q. is within the range for mental retardation, he had significant academic problems as a child, and he has severe deficits in adaptive functioning, such as difficulty learning basic skills involving self-care from childhood through adulthood, trouble | ^comprehending instructions, and trouble learning tasks at work and in moving between assigned projects. He attributes the jury’s finding to the contrary, in part, to frequent misstatements by the state about the nature of mental retardation during voir dire.[20] He alleges these misstatements were left uncorrected and that the district court, in fact, never defined mental retardation for the jurors.[21] The defense also complains that the court misinformed jurors that there was the requirement of unanimity in a finding of mental retardation, which he *455 contends runs afoul of Mills v. Maryland, 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988). The defense also attributes the jury’s determination to a lack of evidence that resulted from defendant’s decision to forego the assistance of counsel, the lack of expert assistance discussed above, and the district court’s refusal to provide additional time for reappointed counsel to prepare for the penalty phase.[22] Based on what it characterizes as an inadequate record, the defense asks, at the minimum, that the matter be remanded for evidentiary hearings on the issue of mental retardation. Finally, the defense argues that the district court should have granted the Motion for New Trial based on the new evidence provided therein of defendant’s deficits.
The United States Supreme Court in Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), held the execution of mentally retarded individuals is excessive under the Eighth Amendment and does not measurably advance the deterrent or the retributive purpose of the death penalty. Id., 536 U.S at 321, 122 S.Ct. at 2252. Atkins was based on the “evolving standards of decency” that have occurred since the Supreme Court’s decision in Penry v. Lynaugh, 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989), allowed the execution of a mentally retarded defendant. State v. Williams, 01-1650 (La.l 1/1/02), 831 So.2d 835. In Atkins, the Supreme Court found the deficiencies of the mentally retarded do not exempt them from criminal sanctions but do diminish their personal culpability, as they are far more likely to act on impulse rather than premeditation, and in a group setting they are more often followers than leaders. Id., 536 U.S. at 318, 122 S.Ct. at 2250. The Atkins Court reiterated one of the purposes of capital punishment is to deter offenders who act with premeditation and deliberation. Id., 536 U.S. at 319, 122 S.Ct. at 2251. Because a mentally retarded offender acts on impulse and not premeditation, the intended deterrent effect of the punishment fails to serve its purpose. Id.
The capital punishment exemption for mentally retarded offenders was codified in Louisiana by the legislative enactment of La.C.Cr.P. art. 905.5.1, which provides a procedure to be used in the event that a capital defendant raises a claim of mental retardation. Under the article, such a defendant has the burden of proving mental retardation by a preponderance of the evidence. La.C.Cr.P. art. 905.5.1(C)(1). The article defines mental retardation as:
a disability characterized by significant limitations in both intellectual functioning and adaptive behavior as expressed in conceptual, social, and practical adaptive skills. The onset must occur before the age of eighteen years.
La.C.Cr.P. art. 905.5.1(H)(1). The article concludes with an advisory list of several medical conditions that “do[ ] not necessarily constitute mental retardation,” which lanincludes learning disabilities. La. C.Cr.P. art. 905.5.1(H)(2)(j). The American Psychiatric Association (“APA”) provides a similar definition as follows:
The essential feature of Mental Retardation is significantly subaverage general intellectual functioning (Criterion A) that is accompanied by significant limitations in adaptive functioning in at *456 least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety (Criterion B). The onset must occur before age 18 years (Criterion C). Mental Retardation has many different etiologies and may be seen as a final common pathway of various pathological processes that affect the functioning of the central nervous system. Diagnostic and Statistical Manual of Mental Disorders 41 (4th ed.2000). “Mild” mental retardation is typically used to describe people with an I.Q. level of 50-55 to approximately 70. Id., at 42^3.
Atkins, 536 U.S. at 308, 122 S.Ct. 2242 at 2245, n. 3,153 L.Ed.2d 335 (2002).
In State v. Turner, 05-2425 (La.7/10/06), 936 So.2d 89, this Court upheld the constitutionality of La.C.Cr.P. art. 905.5.1 generally, and further upheld the statute’s provision that a jury decide the question of mental retardation during a capital sentencing hearing. The statutory procedure was followed in the instant case and the defense offers no controlling or persuasive authority for revisiting Turner, in which this Court found “nothing ... to support a determination that a jury is unreliable for deciding the factual issue of whether the defendant is mentally retarded.” Turner, 05-2425 at 11, 936 So.2d at 98.
Despite defendant’s characterization of the record as incomplete, it contains extensive evidence pertaining to this issue. A school evaluation conducted when defendant was in the fifth grade shows he performed for the most part at the third and fourth grade level, and that he was identified as having a learning disability, which the defense expert conceded is not the same as mental retardation. At his mother’s request, the defendant was never placed in any special education classes. Further, [^defendant continued reading close to grade level before he dropped out of school. His sixth-grade teacher noted in his school record, “Anthony is in the sixth grade and frequently misses school. He has poor study habits, and almost never brings supplies to class. Anthony needs one-on-one instruction in order for him to accomplish anything, not because he can’t but because he won’t.”
Although the defense expert, Dr. Mark Zimmerman, initially diagnosed defendant as mentally retarded with an I.Q. in the 50s, the state’s expert, Dr. Donald Hoppe, was suspicious at the outset that the defendant was malingering to make it appear he was significantly mentally challenged. As Dr. Hoppe obtained additional information, he became firmly convinced the defendant was, in fact, malingering, that his I.Q. scores were invalid, and that he functioned in the normal range. Dr. Hoppe compared Dr. Zimmerman’s test results with his own administered three months later.[23] He found while the results were somewhat consistent overall, internally they were very inconsistent. Defendant’s abilities had changed from test to test. Things he could do and abilities he possessed for Dr. Zimmerman’s test he no longer exhibited for Dr. Hoppe’s test, and vice versa. Also, Dr. Hoppe testified that the “practice effect,” the improvement on tests after repeated administration, was not present even though the last test date was within three months. Dr. Hoppe testified that, according to the large body of research on the “practice effect,” if two I.Q. tests are administered within a three to six month window, the subject’s verbal I.Q. typically *457 increases by three points, the non-verbal I.Q. typically increases by ten to eleven points, and the overall score usually increases by six to seven points. Dr. Hoppe pointed out the defendant’s scores in his verbal I.Q., non-verbal I.Q., and full-scale I.Q. all decreased by at least three points. Furthermore, the defendant read at |32a second-grade level when Dr. Zimmerman administered the test, and three months later told Dr. Hoppe that he was completely illiterate and could not read a single word. Notably, although defendant claimed to be wholly illiterate, at a pretrial motion hearing he referred to the notes he had made on his copy of his motion: “That’s right here, but that’s my copy to argue. I’ve written all over it.” The defendant even answered incorrectly when asked his own age, which was a major red flag to Dr. Hoppe, because even most mentally retarded patients know their own age. Dr. Hoppe concluded the defendant was malingering, placing both I.Q. scores in serious doubt. Based on all the information, Dr. Hoppe concluded that the defendant was definitely not mentally retarded and, instead, actually functions at a higher level. However, even Dr. Zimmerman retracted his original conclusion that defendant was mentally retarded when new information became available and indicated, considering all the factors the state pointed out, that malingering should be investigated. Dr. Zimmerman could only offer his unsupported belief, based on “clinical impressions,” that the defendant was not malingering Dr. Zimmerman also stated that based on what he had seen and heard, he no longer had enough information to conclude the defendant was mentally retarded.
During the court’s determination of the defendant’s competency, a third expert, Dr. John Thompson, was called in by the court to review the previously administered tests and also to perform his own evaluation of the defendant. Dr. Thompson believed the defendant was not putting forth the best effort during his testing, and the defendant actually understood much more about the proceedings than he exhibited. He believed that the defendant had deliberately failed the court competency test and thus, expressed some hesitancy in the test conclusions. Like Dr. Hoppe, Dr. Thompson also believed that the defendant was deliberately underperforming on tests lasso as to appear severely mentally retarded. Thus, Dr. Thompson found that the defendant was likely competent to stand trial.
Several of the defendant’s former employers also testified. The defendant was previously employed at A & R Transport as a tank washer, which also involved filling out inspection reports and certificates of cleanliness. He was later promoted to rack supervisor at A & R, in which he supervised a team of three or four in the disassembly and washing of tanks that house medical pellets.[24] As the supervisor, defendant also trained individuals on the proper procedures for tank truck cleaning at A & R. Defendant was also previously employed as a stocker and cashier at both Winn-Dixie and Piggly Wiggly with no reported problems in functioning. Robert Brown, Erica Bell’s brother, also testified that he worked at Southland Marble with the defendant. The defendant actually assisted Robert Brown in getting a job, and on the day of Robert’s interview, defendant opened up the shop and waited for *458 the boss. At Southland, the defendant and Robert Brown had to measure, mix, pour, and cut marble to specifications. Robert Brown testified that math was involved in the job, and the defendant had no problems with his math skills while working at Southland. Dr. Zimmerman, the defense expert, testified he had spoken with one of the defendant’s previous employers, Terry Maddie, who indicated that defendant, though a hard worker, needed to be supervised closely, did not multitask, and could only perform simple tasks. Dr. Zimmerman relied in part on the information from Maddie as evidence the defendant had a deficiency in adaptive functioning related to work history. However, Dr. Zimmerman did not know and his report was silent as to the type of work defendant performed and the time frame in which the defendant worked | S4with Maddie.[25] Overall, the evidence of defendant’s work history supports a finding that he has no adaptive functioning issues related to work. In addition to the expert and fact testimony, the jury observed the defendant’s self representation during the guilt phase of the trial. There is nothing in the record from which it can be concluded that the jury erred in rejecting the defendant’s claim of mental retardation.[26]
The remainder of the defendant’s complaints regarding the jury’s determination can be quickly dismissed. Although the defense attributes the finding to comments made by the state during voir dire, the jury’s determination seems more readily attributable to the evidence. The statements at issue[27] were introductory in nature, consisted of only a small portion of the state’s presentation on this issue, and are not wholly inconsistent with Atkins, in which the Supreme Court devoted considerable attention to proportionality and “the relationship between mental retardation and the penological purposes served by the death penalty,” Atkins, 536 U.S. at 317-21, 122 S.Ct. at 2250-52. Nor does the defendant explain how the state’s comments altered his burden of proving mental retardation by a preponderance or otherwise misled the Injury. Regardless, the defense did not object at the time the statements were made and the claim is therefore not preserved for review.[28] Although *459 defendant on appeal complains the prosecutor’s statements were highly significant and that they were a fruit of the district court’s ruling permitting him to represent himself, this claim is reminiscent of an assertion that he provided himself with ineffective assistance, which a self-represented defendant may not make.[29]
Finally, regarding the claim that there is new evidence pertaining to the allegation that defendant is mentally retarded and therefore a new trial is appropriate, the evidence attached in support of the Motion for New Trial was all readily available at the time of trial.[30] This Court has repeatedly noted that to obtain a new trial based on “newly discovered evidence,” the defendant has the burden of showing that “(1) the new evidence was discovered after trial, (2) the failure to discover the evidence at the time of the trial was not caused by lack of diligence, (3) the evidence is material to the issues at trial, and (4) the evidence is of such a nature that it would probably have produced a different verdict.” State v. Hammons, 597 So.2d 990, 994 (La.1992); State v. Knapper, 555 So.2d 1335 (La.1990); State v. Prudholm, 446 So.2d 729 (La.1984); State v. Talbot, 408 So.2d 861 (La.1980). In the instant case, the defense fails to show the new evidence was discovered after trial and that the failure to | ¡¡^discover the evidence was not caused by lack of diligence. Therefore, the district court correctly denied the motion for new trial.

CAPITAL SENTENCE REVIEW

In the discharge of the duty imposed by the legislature to “review every sentence of death to determine if it is excessive,” La.C.Cr.P. art. 905.9, this Court will review the record in a capital case to determine: (1) whether the sentence was imposed under the influence of passion, prejudice or any other arbitrary factors; (2) whether the evidence supports the jury’s finding of a statutory aggravating circumstance; and (3) whether the sentence is disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. La.S.Ct. Rule 28, § 1. In the present ease, Rule 28 review demonstrates that defendant’s death sentences are not excessive.

Passion, Prejudice, or Other Arbitrary Factors

There are very few potential sources of passion, prejudice, or other arbitrary factors in the instant case, aside from the allegation that the defendant is mentally retarded, which, as asserted in the defendant’s response to the state’s capital sentencing memorandum, distinguishes his case from other defendants sentenced to death. As discussed at length above, however, the defendant’s claim that he is mentally retarded lacks merit. The court notes the following factors in this case: reappointed counsel had just seven days to prepare a case in mitigation; the defen *460 dant, who is not an attorney, faced the challenging task of picking a capital jury in the context of well-publicized crimes; the defendant repeatedly struggled with the procedure for using transcripts to confront witnesses despite the assistance of standby counsel; and a number of claims were waived by lack of contemporaneous objection from the self-represented defendant. Beyond those concerns, the record does not|37show any potential indicia of passion, prejudice, or arbitrariness. Defendant, an adult black male, killed his wife and several of her extended family and received five death sentences from a jury, during the selection of which no Batson claim was ever asserted. Nothing in the record suggests race was an issue in the trial. Aggravating Circumstances
As demonstrated by the jury’s verdict during the guilt phase of the trial, the state presented sufficient evidence to prove beyond a reasonable doubt that: defendant killed his wife during the commission of a second degree kidnapping; defendant killed three victims who were 65 years of age or older; and defendant killed all victims in a shooting spree. A review of the record suggests the evidence was sufficient to support such a determination. The surviving victim testified that, when defendant entered the church after he was publicly rebuffed by his wife, she heard her mother say “Anthony, don’t shoot me” before she herself was shot in the head. From her vantage point on the floor, she also saw the defendant holding a revolver as he demanded that her daughter leave with him and said, “I told you all I was going to do it.” Although defendant claimed this witness was lying and that his wife was in fact the shooter, he was the primary source of DNA on the murder weapon and the wound to the back of his wife’s head was unlikely to have resulted from suicide. Not only did the murder weapon appear to have been placed in his wife’s hand, one live round from the murder weapon was found in the defendant’s pocket when he was arrested.

Proportionality

The federal Constitution does not require a proportionality review. Pulley v. Harris, 465 U.S. 37, 42-50, 104 S.Ct. 871 875-79, 79 L.Ed.2d 29 (1984). However, comparative proportionality review remains a relevant consideration in determining the issue of excessiveness in Louisiana, State v. Burrell, 561 So.2d 692, 699-700 (La.1990); State v. Wille, 559 So.2d 1321, 1341-42 (La.1990); State v. Thompson, 516 So.2d 349, 356-57 (La.1987), although the Court has set aside only one death penalty as disproportionately excessive under the post-1976 statutes, finding in that one case, inter alia, a sufficiently “large number of persuasive mitigating factors.” State v. Sonnier, 380 So.2d 1, 9 (La.1979); see also State v. Weiland, 505 So.2d 702, 707-10 (La.1987) (in case reversed on other grounds, dictum suggesting that death penalty disproportionate).
The Uniform Capital Sentence Report reveals that defendant is a black male born on October 13, 1980. He was 26 years old at the time of the offense and is now 29 years old. He was classified as learning disabled in the fifth grade and dropped out of ninth grade. He has a sporadic employment history with a reported average earning of roughly $9000 per year from 1997 to 2006. He was arrested in 1999 on charges of stalking, aggravated battery, false imprisonment, and unauthorized entry, and he pled guilty to unauthorized entry. He also pled guilty to possession of marijuana in 2001. At the time of the offense, he had just been rehired as a cashier/stocker at a Piggly Wiggly and had separated from his wife. He has three children.
*461 According to the state, 27 persons have been tried for first degree murder in East Baton Rouge Parish since 1979 in which more than one victim, a victim over the age of 65, or an estranged wife was killed. Of these cases, 14 defendants received life sentences, 12 received death sentences, and one withdrew his plea and pled guilty to manslaughter. Of those sentenced to death, four killed a victim over the age of 65, five killed multiple victims, two killed multiple victims over the age of 65, and one killed a spouse and victims over the age of 65. One death sentence was reversed on appeal, one inmate was executed, one died of natural causes on death row, and five ^appeals are pending.
A review of the capital verdicts from East Baton Rouge Parish does not suggest that Anthony Bell received a disproportionately harsh sentence. The state compares the instant defendant to Robert Wayne Williams, Allen Robertson Jr., and Gregory C. Brown. State v. Williams, 383 So.2d 369 (La.1980); State v. Robertson, 97-0177 (La.3/4/98), 712 So.2d 8; State v. Brown, 03-0897 (La.4/12/05), 907 So.2d 1. On January 5, 1979, Robert Wayne Williams and Ralph Holmes entered the A & P Supermarket located at 3525 Perkins Road in Baton Rouge. Both men placed ski masks over their faces and Williams pulled out a 12-gauge sawed-off shotgun. They then approached the security guard, Willie Kelly, age 67, who was bagging groceries. As Kelly made a move with his hand toward his pistol, Williams yelled “Don’t try it,” and immediately shot Kelly in the face at point blank range. During the robbery, Holmes pistol-whipped one of the customers, and Williams accidentally shot two people in their feet. Williams’s conviction and sentence were upheld on appeal and Williams was executed on December 14,1983.
On January 1, 1991, Allen Robertson Jr. left a nightclub with the intention of stealing something which he could sell for money to buy drugs. He entered the home of Morris and Kazuko Prestenback, an elderly couple, who were asleep. Robertson seized a 13" butcher knife and then proceeded to hit, cut, slash and stab 76-year-old Morris Prestenback. Robertson then stabbed 71-year-old Kazuko Prestenback multiple times. Direct review has been completed arid Robertson is presently pursuing collateral review.
On October 4, 1998, Gregory C. Brown, along with Jonathan Booth, Bryan Risin, Brian Williams, and Eldrich Thompson engaged in a campaign of terror that culminated with the shooting deaths of William and Ann Gay of Clinton. First, the | .ingroup entered a residence and attacked Davy Thompson, ultimately resulting in Brown shooting Thompson in the thigh and also inadvertently shooting Booth in the upper arm. In their haste to escape, they were involved in an automobile accident three to four blocks from Thompson’s residence, running a stop sign and striking a vehicle driven by 68-year-old Sarah Chaney. Brown, Eldrich Thompson, and Brian Williams fled on foot and approached Ikie Roberts, from whom they demanded transportation. When he declined, Brown flew into a fit of rage and picked up a nearby 16-ounce Craftsman claw hammer. Brown then kicked in the back door of 85-year-old Myrtle Roberts, threw her to the ground, breaking her wrist, and demanded the keys to the truck. He then moved on to the adjacent house, the home of 62-year-old William and 60-year-old Ann Gay, both of whom Brown killed. Brown is also pursuing collateral review.
It is difficult to say that any of the cases submitted in the Capital Sentencing Memorandum by the state is closely comparable *462 to the offenses committed by the defendant in the instant case. The instant offense involves a shooting spree with elderly victims at a church and the kidnapping and murder of the defendant’s wife with substantially less brutality than that involved in State v. Brown, for example, although it involves a greater number of victims. However, a state-wide review of cases reveals that jurors generally consider death to be the appropriate penalty for the murder of multiple victims over the age of 65. See, e.g., State v. Holmes, 06-2988 (La.12/2/08), 5 So.3d 42; see also State v. Burrell, 561 So.2d 692 (La.1990); State v. Wingo, 457 So.2d 1159 (La.1984).
Furthermore, as noted above, at the time of the offense, defendant was 26 years old. This Court has affirmed death verdicts for defendants as young as 17 years old at the time of the offense. State v. Craig, 95-2499 (La.5/29/97), 699 So.2d 865, cert. denied, 522 U.S. 935, 118 S.Ct. 343, 139 L.Ed.2d 266 (1997); State v. Comeaux, 93-2729 (7/1/97), 699 So.2d 16; State v. Prejean, 379 So.2d 240 (La.1979), cert. denied, 449 U.S. 891, 101 S.Ct. 253, 66 L.Ed.2d 119 (1980). Compared to these cases, the death penalty imposed on the defendant, Anthony Bell, for the first-degree murders of Erica Bell, Leonard and Gloria Howard, Doloris McGrew, and Darlene Mills Selvage is not disproportionate.
DECREE
For the reasons assigned herein, the defendant’s convictions and death sentences are affirmed. This judgment becomes final on direct review when either: (1) the defendant fails to petition timely the United States Supreme Court for cer-tiorari; or (2) that Court denies his petition for certiorari; and either (a) the defendant, having filed for and been denied certiorari, fails to petition the United States Supreme Court timely, under its prevailing rules, for rehearing of denial of certiorari; or (b) that Court denies his petition for rehearing. The district court shall upon receiving notice from this Court under La.C.Cr.P. art. 923 of finality of direct appeal, and before signing the warrant of execution, as provided by La. R.S. 15:567(B), immediately notify the Louisiana Indigent Defense Assistance Board and provide the Board with a reasonable time in which: (1) to enroll counsel to represent the defendant in any state post-conviction proceedings, if appropriate, pursuant to its authority under La. R.S. 15:169; and (2) to litigate expeditiously the claims raised in that application, if filed in the state courts.
AFFIRMED.

 Retired Judge Philip C. Ciaccio, assigned as Justice ad hoc, sitting for Chief Justice Catherine D. Kimball.

. The jury ultimately rejected defendant’s claim that he is mentally retarded.

. The district court's handling of purported juror distress at the extended sequestration formed the basis of a request for a mistrial on April 15, 2008, and is assigned as error.

.This included Erica Bell; her relatives, Leonard and Gloria Howard; Doloris *441 McGrew; Darlene Mills Selvage; and Erica's mother, Claudia Brown.

. Three of the five children were Erica and Anthony Bell’s sons. The two remaining children were relatives of the attendees. Notably, D.M., who was six years old at the time of the shootings, was interviewed shortly after the incident and testified at the trial.

. Both the state and the defense played defendant’s 911 call to the jury. Notably, at some point in the call, according to the state, defendant could be heard to exclaim "I didn’t mean to kill her,” however, according to the defense, defendant said "I didn’t mean to cheat on her.”

. Notably, Erica's finger was not in the trigger guard but instead rested farther down the weapon’s handle.

. Specifically, a firearms expert testified that the revolver found in Erica’s hand produced the spent casings found at the church and also fired the bullets recovered from the bodies of Erica Bell and Darlene Selvage. The bullet fragments recovered from the other victims did not permit identification.

. On cross-examination, defendant elicited from the state’s expert an alternative explanation for his DNA on the weapon: a person who grabbed a gun without firing it could deposit DNA on the weapon.

. The statement was ordered redacted by this Court in pre-trial writ review to eliminate the portion that followed defendant’s clear and unambiguous invocation of his right to counsel. The redacted recording had been reviewed by the defense and was played for the jury without objection. State v. Bell, 07-1124 (La.6/29/07), 958 So.2d 1173.

. In Faretta, the Court cited Allen for the proposition that "the trial judge may terminate self-representation by a defendant who deliberately engages in serious and obstructionist misconduct.” 422 U.S. at 834 n. 46, 95 S.Ct. at 2541.

. In State v. Campbell, 06-0286 (La.5/21/08), 983 So.2d 810, 853 n. 149, this court's analy-ses of the effect of the then pending Edwards decision was correct and remains relevant to this case:
We are aware that the United States Supreme Court has granted certiorari and heard oral argument in the case of Indiana v. Edwards, 07-208. However, the question presented in Edwards is whether a state may impose a higher standard: “May a criminal defendant who, despite being legally competent, is schizophrenic, delusional, and mentally decompensatory in the course of a simple conversation, be denied the right to represent himself at trial when the trial court reasonably concludes that permitting self-representation would deny the defendant a fair trial.” The State of Indiana required a criminal defendant who requested self-representation to meet a higher standard of competency than the standard of competency for proceeding to trial. Louisiana does not impose a higher standard: thus, we do not believe the Court’s holding in Edwards will impact our decision here....

. The test for competency to stand trial in Dusky is "whether [the defendant] has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding and whether he has a rational as well as factual understanding of the proceedings against him.” Id.

. A defendant who is represented by counsel has no Sixth Amendment right to participate as co-counsel. United States v. Wolfish, 525 F.2d 457 (2nd Cir.1975); United States v. Norris, 780 F.2d 1207 (5th Cir. 1986); Julius v. Johnson, 755 F.2d 1403 (11th Cir.1985); State v. McCabe, 420 So.2d 955 (La.1982); State v. Bodley, 394 So.2d 584 (La.1981). However, this principle has typically rested on Faretta s silence on the issue rather than any positive statement from the United States Supreme Court.

. Defendant also filed numerous pro se motions for change of venue, speedy trial, and to discover and disclose evidence favorable to the defense.

. The defendant believed he was not getting all the copies and documents from his appointed counsel and stated at the hearing, "I only filed a motion [to represent myself] so I can get copies of my case. And I don't want to proceed with the motion.... I do not want to represent myself at trial.” The district court then explicitly confirmed several times that defendant did not want to represent himself and wanted the assistance of counsel.

. In particular, the defense points to the exchange in which the defendant withdrew his motion for self-representation stating, "I filed a motion to represent myself, to get all the copies of my case.... I don’t know what's going on in my case; so I filed a motion to represent myself knowing that the Office of the Public Defender would have to tell everything to me on my case.” Further, at the February 28 hearing, the defendant stated, "I’m not getting effective assistance with counsel, why should I go forward with letting her — -letting them represent me, if I feel like I’m being withheld — documents being withheld from me?”

. The United States Supreme Court first declared the right of indigent criminal defendants to appointment of experts at public expense in Ake v. Oklahoma, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985). In Ake, 470 U.S. at 76, 105 S.Ct. at 1092, the Court reasoned that “when a State brings its judicial power to bear on an indigent defendant in a criminal proceeding, it must take steps to assure that the defendant has a fair opportunity to present his defense.” The Ake court found due process required the appointment of an expert in that case because "a criminal trial is fundamentally unfair if the State proceeds against an indigent defendant without making certain that he has access to the raw materials integral to the building of an effective defense.” Ake, 470 U.S. at 77, 105 S.Ct. at 1087. Building upon Ake, Louisiana is among the majority of jurisdictions that have found that under the federal and their respective state laws, indigent defendants represented by pro bono or retained counsel are entitled to state funding for various defense costs, including expert witness fees. See Ex Parte Sanders v. State, 612 So.2d 1199 (Ala.1993); Dubose v. State, 662 So.2d 1156 (Ala.Crim.App.1993); Jacobson v. Anderson, 203 Ariz. 543, 57 P.3d 733 (Ct.App.2002); Tran v. Superior Court, 92 Cal.App.4th 1149, 112 Cal.Rptr.2d 506 (2001); People v. Worthy, 109 Cal.App.3d 514, 167 Cal.Rptr. 402 (1980); Cain v. State, 758 So.2d 1257 (Fla.Dist.Ct.App.2000); Thompson v. State, 525 So.2d 1011 (Fla.Dist.Ct.App.1988); Arnold v. Higa, 61 Haw. 203, 600 P.2d 1383 (1979); State v. Evans, 271 Ill.App.3d 495, 208 Ill.Dec. 42, 648 N.E.2d 964 (1995); Beauchamp v. State, 788 N.E.2d 881 (Ind.Ct.App.2003); English v. Missildine, 311 N.W.2d 292 (Iowa 1981); Kenton-Gallatin-Boone Public Defender, Inc. v. Stephens, 819 S.W.2d 37 (Ky.1991); Morton v. Commonwealth, 817 S.W.2d 218 (Ky.1991); State v. Green, 631 So.2d 11 (La.App. 2 Cir.1993); Howell v. State, 860 So.2d 704 (Miss.2003); Widdis v. Second Judicial Dist. Court, 114 Nev. 1224, 968 P.2d 1165 (1998); In re Cannady, 126 N.J. 486, 600 A.2d 459 (1991); State v. Manning, 234 N.J.Super. 147, 560 A.2d 693 (Ct.App.Div.1989); State v. Boyd, 332 N.C. 101, 418 S.E.2d 471 (1992); State v. Burns, 4 P.3d 795 (Utah 2000); State v. Wool, 162 Vt. 342, 648 A.2d 655 (1994); State v. Wilkes, 193 W.Va. 206, 455 S.E.2d 575 (1995); State v. Jones, 97-2593 (La.3/4/98), 707 So.2d 975. The right of an indigent, self-represented defendant to the same resources has been addressed less commonly. However, in the instant case, considering the defendant's own delay and poor showing of necessity, cf. State v. Touchet, 93-2839, p. 6 (La.9/6/94), 642 So.2d 1213, 1216 ("for an indigent defendant to be granted the services of an expert at the expense of the state, he must establish that there exists a reasonable probability both that an expert would be of assistance to the defense and that the denial of expert assistance would result in a fundamentally unfair trial.”), which is described infra, it is unnecessary to delve into his entitlement to these resources.

. La.C.Cr.P. art. 905.5.1(A) states: "Notwithstanding any other provisions of law to the contrary, no person who is mentally retarded shall be subjected to a sentence of death.”

. Specifically, defendant complains the state repeatedly indicated during voir dire that the reason a mentally retarded offender is exempt from capital punishment is that the mentally retarded offender cannot comprehend the punishment being inflicted. These comments were not objected to contemporaneously.

. Regarding the latter complaint, neither defendant nor standby counsel, who reviewed the jury charges, ever objected on this basis and therefore the claim is precluded post-Wessinger. See State v. Wessinger, 98-1234, pp. 19-20 (La.5/28/99), 736 So.2d 162, 180-81 (on a prospective basis, the court will no longer consider alleged errors in the penalty phase of a capital trial absent a contemporaneous objection). Furthermore, the jury had the benefit of an accurate description of the controlling statutory framework in voir dire as well as expert testimony on the diagnosis of mental retardation.

. As noted above, reappointed counsel requested a 60-day recess between the guilt and penalty phases. The district court permitted two days, which this Court extended to five. State v. Bell, 2008-804 (La.4/15/08), 979 So.2d 485. Therefore, this Court has already evaluated the question and made the determination that an extension of two days for a total of five days was sufficient.

. Defendant scored a 53 on the I.Q. test administered by Dr. Zimmerman and a 50 on Dr. Hoppe’s administration. Both doctors administered the same I.Q. test.

. Steve Robinson, a manager at A & R Transport, testified that the company hauls loads of specialized plastic colored pellets for various uses including medical usage. The truck tanks must be cleaned thoroughly for contamination, and if not done properly, could cost the company upwards of $40,000.

. Maddie also testified during the guilt phase of trial as one of the defendant's witnesses. During his testimony he indicated the defendant worked for him for three or for years pouring marble, setting up, cleaning molds, and waxing.

. This Court recently affirmed another jury’s determination that a defendant was not mentally retarded because the finding was "neither irrational nor arbitrary.” See State v. Lee, 05-2098, p. 58 (La. 1/16/08), 976 So.2d 109, 147.

. For example the prosecutor stated:
The United States Supreme Court came out with a concept about mitigating circumstances, and it’s called retardation. One of the theories of sentencing an individual who’s committed a crime is they must understand that the sentence they’re getting is as a result of what they did, okay? Because it doesn’t do any good to sentence someone for doing something if they don't know why they’re being treated the way they’re being treated is because they did this action, because it serves no purpose. And the supreme court has stated that individuals who are truly retarded can't understand I’m being put in jail, I’m being given the death penalty because I did these actions, which is fair, which is reasonable. You know, if they don’t understand — it's the reason we don’t put kids in jail, because they don’t understand jail, okay? Does that seem fair to everybody?

. The defense also claims the court’s instruction left the jurors with the impression that they must find mitigating circumstances unanimously, before considering them, citing Mills v. Maryland, 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988). This claim is waived post-Wessinger by the lack of a contemporaneous objection.

. An accused who chooses to represent himself may not complain on appeal that his self-representation was inadequate. Faretta, 422 U.S. at 834, 95 S.Ct. at 2541; see also State v. Dupre, 500 So.2d 873, 875 (La.App. 1 Cir.1986).

. This evidence consists primarily of defendant’s earning statements, the statements of family and friends of the defendant, at least one of whom testified at trial, and another revised opinion by defense expert Dr. Zimmerman, in which he indicates that the defense had provided him with additional information, which "if true, would be used to demonstrate deficits of adaptive functioning ... in academic ability/performance, his vocational skills, his ability to function in the community, and daily living skills.” Therefore, Dr. Zimmerman suggested that if "the material were accepted as credible then a diagnosis of mental retardation would be appropriate.”