PER CURIAM:
1, Writ denied. In 2008, an East Baton Rouge Parish jury found relator, Anthony Bell, guilty of the first degree murders of his wife Erica Bell, Leonard Howard, Gloria Howard, Doloris McGrew, and Darlene Mills Selvage; and the attempted first-degree murder of his mother-in-law, Claudia Brown. For the following reasons, we find no error in the district court’s denial of post-conviction relief and we attach hereto and make a part hereof the district court’s written ruling.
At trial, the state’s evidence showed that in May of 2006, after arguing with his estranged wife, relator entered the small family church led by Claudia Brown and shot all adults present for church services, except his wife whom he abducted. Four of those victims died as a result of their injuries but Brown survived despite being shot in the back of the head. Relator did not harm any of the five children present and one child was able to locate a cell phone, which Brown used to call 911 as she regained consciousness. Brown reported to the 911 operator that relator was the shooter and described his clothing.
| /Taking his wife and their three children along with him, relator first drove to a relative’s home, where he dropped off the older two children, then to the parking lot of an apartment complex. While in the car with his wife and their infant, relator shot his wife in the back of the head with the same gun that he used in the church, killing her. He then placed the gun in her hand, called 911, and waited at the scene holding their infant, where he was arrested. Relator gave both an unrecorded statement and a recorded statement to police, in which he claimed his wife committed the church shootings and then shot herself because she was distraught over his affairs and the breakup of their marriage.
Relator was initially represented by appointed counsel. On the defense’s request, the trial court appointed a sanity commission to determine whether relator was competent to proceed and appointed experts to determine his I.Q. for purposes of the defense’s motion to quash the death penalty pursuant to Atkins v. Virginia.[1] *331 The court found relator competent to proceed, but declined to resolve the Atkins claim before trial because the parties did not agree to leave the determination to the court pursuant to La.C.Cr.P. 905.5.1.
Frustrated that his court-appointed attorneys were not pursuing his defense that his wife shot the victims and then herself in response to relator’s disclosure that he was having an affair with her mother, and convinced his attorneys were withholding information from him, relator began filing pro-se motions to dismiss one or both of the attorneys and to represent himself. Eventually, on February 28, 2008, the trial court granted relator’s motion to represent himself and his attorneys continued to assist as standby counsel throughout the guilt phase of trial.
The jury found relator guilty as charged on each count. Relator requested that appointed counsel be reinstated for the penalty phase. The court .granted his ^request but denied the 60-day extension for preparation that relator requested, which left defense counsel five days to prepare for sentencing. After the sentencing hearing, jurors rejected relator’s intellectual disability claim and unanimously agreed to impose a sentence of death in light of the aggravating circumstances that relator killed Erica Bell during the commission of a second degree kidnapping; the victims Leonard Howard, Gloria Howard, and Do-loris McGrew were 65 years of age or older; and that relator possessed specific intent to kill multiple persons.
The trial court sentenced relator to death by lethal injection for each of the five counts of first degree murder, and to 50 years imprisonment at hard labor without benefit of parole, probation, or suspension of sentence for attempted first degree murder. The convictions and sentences were affirmed. State v. Bell, 09-0199 (La. 11/30/10), 53 So.3d 437, reh’g denied, (La. 1/14/11), cert. denied sub nom. Bell v. Louisiana, 564 U.S. 1025, 131 S.Ct. 3035, 180 L.Ed.2d 856 (2011). In 2013, relator filed an application for post-conviction relief, which the district court denied with written reasons.
Relator first contends that an MRI and neuropsychological evaluation conducted in 2013, seven years after the shootings and five years after his trial, reveals that he suffers from a previously undiscovered brain asymmetry[2] and undiagnosed mental illness in the form of bipolar disorder and grandiosity. He claims these conditions render him incompetent in a manner distinct from the previously litigated questions of his competency to stand trial and his intellectual disability and justify the reopening of several claims. However, the issue of his | competence was thoroughly addressed at trial and on direct review.[3] *332 Although he now argues that a previously undiscovered medical basis underlies these previously litigated claims, a competence determination rests on a defendant’s capacity to understand the proceedings or assist in his defense. La.C.Cr.P. art. 641. The jury and trial judge had the opportunity to extensively observe relator’s lucid and capable behavior as he represented himself during the guilt phase, and those firsthand observations were undoubtedly factored into the jury’s determinations at both phases of trial. Relator fails to show that the new evidence about his brain structures and his performance on tests conducted several years later are relevant to the issue of his competency to stand trial or would have affected the verdicts. As evaluating psychologist Dr. Donald Hoppe noted in a letter[4] at the conclusion of relator’s trial:
Mr. Bell has more recently requested, and has been allowed, to serve as his own attorney. I had the opportunity to observe him in the court room during voir dire on April 2, 2008. His behavior at this time was remarkably different from what I had seen earlier. Mr. Bell clearly had no difficulty following what was going on in court. He was | ¡¡observed to be reading and writing with no apparent difficulty. He was articulate, even eloquent in his arguments before the court. Several times he correctly cited Louisiana law and the court ruled in his favor. The questions which he posed to prospective jurors were well-planned and carefully crafted. All of this directly observed behavior strongly weighs against Mr. Bell’s true level of intelligence falling in the 50-53 range.
Based on the highly doubtful IQ test results and direct observation of average to above average conceptual, social, and practical adaptive skills, it is my opinion that Anthony Bell is definitely not mentally retarded.
(emphasis in original). Relator fails to show that the interests of justice require the Court to revisit his intellectual ability or competence. La.C.Cr.P. art. 930.4.
Moreover, as the district court found in its post-conviction ruling, the 2013 neurop-sychological reports do not contain any credible evidence that relator suffers from “severe brain damage” and mental illness as he claims. To the contrary, the initial MRI report identifies several normal brain structures[5] and concludes relator’s “Study [was] within normal limits.” Likewise, the report from Sundeep Mangla, M.D., who performed an independent evaluation of the same MRI, identifies merely that “there may be mild asymmetry of the *333 medial temporal lobes and hippocampal gyri, ... [but that n]o abnormality or asymmetry of signal intensity is observed within these temporal lobe regions,” and that “[t]he remainder of the Brain MRI appears structurally normal without evidence of tumor, stroke, or significant asymmetry in morphology or signal intensity.”
On the other hand, a 2013 neuropsychia-tric exam authored by George Woods, M.D., quotes relator’s MRI report finding that his brain is “within normal limits,” but interprets relator’s partly empty sella (previously identified as a pituitary issue) and structural asymmetries as indicative of abnormality. He refers to yet another interpretation of the same images conducted by Erin Bigler, Ph.D., Rwhom Dr. Woods claims described the asymmetry as roughly 20%. Dr. Woods concludes that relator’s neuropsychological examination and “poor performance” at trial[6] are direct manifestations of relator’s brain asymmetry, and concludes that relator suffers from bipolar disorder, secondary to a general medical condition. In the same vein, a 2013 neurop-sychological report authored by Robert Shaffer, Ph.D., indicates testing showed relator’s intelligence to be in the low average range. After summarizing the various neuropsychological tests performed, the report concludes that relator’s “MRI brain scans and neuropsychological tests demonstrate abnormal structure and impairment of important neuropsychological functions” which show relator “suffers from an organic, brain-based condition causing grandiosity,” potentially causing relator to overestimate his own abilities and demonstrate judgment poorer than expected for someone with low average intelligence. The report also concludes that because of this, although relator was 25 years old at the time of the offenses, he “would have displayed characteristics of youth in their developmental period younger than 18.”
On the whole, relator uses the 2013 neu-ropsychological testing to draw retrospective, speculative, and unprovable conclusions about his mental functioning at the time of the offenses and at trial, based on tests performed years later. Even if the test results relator now offers had been available at trial, they would have had no reasonable likelihood of affecting the outcome. Although the reports opine that relator suffers from poor judgment and poor impulse control, they are in no way inconsistent with the finding at trial that relator is not intellectually disabled nor do they reveal any new information about relator’s “capacity to understand the proceedings against him or to assist in his defense.” See La.C.Cr.P. art. 641. Rather, it appears the expert opinions that relator suffers 17from poor impulse control and poor judgment may have even been detrimental to his defense. In sum, because this new evidence is not so compelling that no reasonable juror could have voted to convict him with knowledge thereof, see State v. Pierre, 13-0873 (La. 10/15/13), 125 So.3d 403, relator has shown no error in the district court’s rejection of it.[7] Moreover, because this new *334 information does nothing to change this Court’s analysis of any related claims that were fully litigated on appeal, relator has not shown that the interest of justice requires this Court to reconsider them now. La.C.Cr.P. art. 930.4(A).[8]
Relator next argues that the prosecution committed misconduct by failing to disclose that between November 2007 and March 2008, the jailhouse law librarian wrote several letters to the prosecution in which he offered information about relator’s trial preparation and requested leniency in his own pending prosecution. Although relator invokes Massiah v. United States, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964) and the cases that followed it, the doctrine addressed therein bars the introduction of a defendant’s incriminating statements if the | Sstatements were intentionally elicited by a jailhouse informant acting as a government agent and in the absence of counsel. Because relator does not allege that he made any incriminating statements to the law librarian, that case appears inapposite. Further, relator does not show that the law librarian acted as an agent for the state. Relator surmises that the warden intentionally selected that individual, a police officer charged with theft and fraud in the line of duty, to serve as the law librarian because his “predisposition to dishonesty was obvious” given his pending charges, but his theory that the warden predicted the librarian’s actions is pure conjecture. Nothing indicates that the warden and prosecutors acted in concert, or that the prosecution solicited the letters, encouraged them, obtained any advantage from them, or even responded to them.[9] Rather, the letters merely reflect an aspiring snitch who offered his services in the hopes of leniency, and do not appear to contain any incriminating information or confidences relayed by relator. Notably, communications with jailhouse law librarians, who are typically not attorneys, are not privileged. See e.g,, State v. Myers, 02-1296 (La.App. 3 Cir. 3/5/03), 839 So.2d 1183. Accordingly, though the prosecutor failed to disclose the letters, *335 because there is no indication they were in any way used at trial (much less to prejudicial effect), relator fails to show that the district court erred in rejecting this claim. La.C.Cr.P. art. 930.2.
Relator next argues that his conviction should be reversed because the trial court’s evidentiary rulings and restriction of relator’s case to a single day prevented him from presenting a defense. Specifically, he claims the court 19“pressured” him to call his witnesses within one day, but does not show that any witnesses or evidence were erroneously excluded as a result.[10] Because these are issues of which he had knowledge and raised in the trial court, yet inexcusably failed to pursue on appeal, the district court did not abuse its discretion in rejecting the claims. La.C.Cr.P. art. 930.4(C).
Relator next argues that his absence from various pretrial proceedings, and appointed counsel’s failure to object thereto, denied him due process and violated unspecified Sixth Amendment rights. Relator contends he was absent from 16 of the 41 pretrial conferences and hearings before he assumed his own representation. As an initial matter, relator does not explain how his absence from any of these pretrial proceedings violated his substantial rights. In any event, as indicated by the district court’s ruling dismissing this claim, with the exception of an emergency gag order request by the defense, the proceedings from which relator was absent |1ftconsisted of housekeeping matters. Because he does not show that he was absent from any constitutionally significant proceedings or proceedings at which his attendance was obligatory, see La.C.Cr.P. art. 831, the claim fails.
Relator next alleges he received ineffective assistance pre-trial from court-ap *336 pointed counsel. He claims counsel erred by failing to investigate his mental health, failing to retain an expert who would have established that he was not competent to represent himself, and failing to prevent his waiver of counsel. He posits that such an expert would have shown that he suffered from mental illness and “brain damage,” and as a result the trial court would not have permitted his “disastrous” self-representation. He also claims pre-waiver counsel failed to investigate, and thereby failed to retain experts to examine the DNA evidence, fingerprint evidence, and gunshot evidence “to create reasonable doubt.”
Relator urges that the district court erred by citing Faretta[11] in finding that he waived any ineffective assistance of counsel claims when he chose to represent himself, because Faretta does not specifically address claims that pre-waiver appointed attorneys were ineffective. Though relator does not point to any law supporting his argument that pre-waiver ineffectiveness claims remain viable after a waiver of counsel, even assuming arguendo that Faretta does not bar such claims, relator’s precise claims were in fact waived because they were all within the purview of his self-representation.[12] Moreover, as set out on appeal, relator’s court-appointed attorneys zealously attempted to prevent his self-representation:
^Additionally, after defendant had been representing himself for over two weeks, his standby counsel filed a Motion to Reconsider Defendant’s Pro Se Motion to Dismiss Counsel, and the motion was heard seven days later. At this hearing, defendant stated, “Your Honor, if I can’t—if I can’t have my attorneys and be—be co-counsel with them, I will represent myself, and I don’t want to entertain their motion.” The court attempted to confirm once again that the defendant knew there is no right to be both represented and represent yourself, he had every right to take the stand regardless of his representation, he is not being withheld discovery that representing himself will allow him to obtain, and he has been provided or allowed to inspect every piece of evidence in the case. Defendant confirmed he understood the above, but objected to the statement that he had received all of the evidence, as there was a dispute about a certain statement and a few other items that were absent from a box the state provided to the defendant. After standby counsel and the state were heard on the motion, the court insisted the defendant articulate why he opposed their motion. The defendant stated, “Because I wouldn’t be able to—I wouldn’t be able to act as co-counsel at my trial. That’s the only reason why I’m objecting to their motion.” The court then asked what he wanted to have the ability to do as co-counsel. The defendant stated, “Talk just like my lawyer would be able to talk to witnesses, question witnesses.” The defendant then reiterated his desire to act as co-counsel if he had that right, *337 but absent that right he stated, “I’m representing myself.” It is clear the defendant in this case desired to represent himself, and was well-apprised of the dangers and pitfalls of his venture.
Bell, 09-0199, pp. 21-22, 53 So.3d at 451.
Relator further argues that counsel, who later re-enrolled for the penalty phase at relator’s request, made numerous errors. First, he argues that penalty phase counsel erred by failing to present mitigation evidence, including evidence of his life history, brain abnormalities, and mental illness.
A defendant at the capital penalty phase is entitled to the assistance of a reasonably competent attorney acting as a diligent, conscientious advocate for his life. State v. Fuller, 454 So.2d 119, 124 (La. 1984). Thus, counsel’s role at capital sentencing resembles his role at the guilt phase in that he must “ensure that the adversarial testing process works to produce a just result.” Burger v. Kemp, 483 U.S. 776, 788-89, 107 S.Ct. 3114, 3122-26, 97 L.Ed.2d 638 (1987). A finding of ineffective assistance of counsel at the penalty phase requires a showing that | ^counsel failed to undertake “a reasonable investigation [which] would have uncovered mitigating evidence,” and that failing to put on the available mitigating evidence “was not a tactical decision but reflects a failure by counsel to advocate for his client’s cause,” which resulted in “actual prejudice.” State v. Hamilton, 92-2639, p. 6 (La. 7/1/97), 699 So.2d 29, 32.
Here, though penalty phase counsel presented an Atkins defense,[13] relator argues that counsel failed to investigate with sufficient zeal to discover his alleged brain abnormalities, which could have served as mitigation evidence. However, as discussed above, relator fails to demonstrate that at the time of the offense he suffered from any brain abnormalities or mental illness which would have caused impaired capacity “to appreciate the criminality of his conduct or to conform his conduct to the requirements of law.” See La.C.Cr.P. art. 905.5. Moreover, though relator alleges counsel erred by failing to investigate his potential brain abnormalities, separate and apart from the intellectual disability inquiry, and refers to counsel’s failure to ensure he received an MRI, prison medical records show that an MRI was ordered for relator before trial, not because of his cognitive functioning, but rather to evaluate his pituitary gland for abnormalities because he was suffering from enlarged breast tissue. Because the facility did not have MRI equipment, it conducted a CT scan, which revealed “no acute or significant intracranial abnormality.” Under these circumstances, relator fails to show that there was any reasonable basis to pursue further investigation at that point, or that such investigation would have revealed' anything helpful, given that the first two doctors to examine his subsequent 2013 MRI results noted they were “within |1snormal limits” and showed “no abnormality.” Thus, relator has not shown, as required under Hamilton, that counsel’s penalty phase investigation resulted in the omission of mitigating evidence, and this claim fails. See Hamilton, 92-2639 p. 6, 699 So.2d at 32; see also Wiggins v. Smith, 539 U.S. 510, 527, 123 S.Ct. 2527, 2538, 156 L.Ed.2d 471 (2003) (“In assessing the reasonableness of an attorney’s *338 investigation ... a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further.”).[14]
Relator also shows no prejudice as a result of counsel’s failure to object to the injection of allegedly inapplicable aggravating factors in a case in which the state provided sufficient evidence to support the jury’s findings that he killed his wife during a second degree kidnapping; that he killed three victims who were 65 years of age or older; and that he killed all victims in a shooting spree. See, e.g., State v. Monroe, 397 So.2d 1258, 1276 (La. 1981) (“Where two or more statutory aggravating circumstances are found by the jury, the failure of one circumstance does not so taint the proceedings as to invalidate the other aggravating circumstance found and the sentence of death based thereon.”). This claim fails.[15]
|uFinally, relator fails to show that he received ineffective assistance of appellate counsel because counsel failed to raise the claims discussed above. Relator does not have a right to designate the issues that counsel raises on appeal, see Jones v. Barnes, 463 U.S. 745, 751-53, 103 S.Ct. 3308, 3312-13, 77 L.Ed.2d 987 (1983), and would be entitled to relief only if he can show both that (1) counsel erred by “ignoring] issues ... clearly stronger than those presented,” see Smith v. Robbins, 528 U.S. 259, 288, 120 S.Ct. 746, 765, 145 L.Ed.2d 756 (2000) (citation and internal quotation marks omitted), and (2) a “reasonable probability” that he would have prevailed on the claim on appeal. Mayo v. Henderson, 13 F.3d 528, 533-34 (2d Cir. 1994). Because the claims are meritless, appellate counsel did not render ineffective assistance by failing to raise them.
Relator has now fully litigated his application for post-conviction relief in state court. Similar to federal habeas relief, see 28 U.S.C. § 2244, Louisiana’s post-conviction procedure envisions the filing of a second or successive application only under the narrow circumstances provided in *339 La.C.Cr.P. art. 930.4. Notably, the Legislature in 2013 La. Acts 251 amended that article to make the procedural bars against successive filings mandatory. Relator’s claims have now been fully litigated in accord with La.C.Cr.P, art. 930.6, and this denial is final. Hereafter, unless he can show that one of the narrow exceptions authorizing the filing of a successive application applies, relator has exhausted his right to state collateral review. The district court is ordered to record a minute entry consistent with this per curiam.

. In Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), the Supreme *331 Court held that the Eighth Amendment prohibits execution of the intellectually disabled.

. Relator characterizes the asymmetry as "severe brain damage.” However, his medical reports do not support the use of that phrase as it is conventionally understood, as relator is not alleging that his brain was damaged by any traumatic injury or disease process. Two of the reports on his brain imaging identified his brain as within normal limits. The reports noted, at most, mild asymmetry in some portions of his brain, and none of the reports offer any supposition as to the reasons for the asymmetry.

. As this Court noted on direct review:
Before defendant dismissed his appointed counsel, they placed his mental status at issue in, separate but interrelated motions. First, on June 22, 2006, the defense asked the district court to appoint a sanity commission to determine whether the defendant was competent to proceed. Second, on July 5, 2006, the defense asked the district court to appoint experts to determine the defendant's I.Q. in light of the Supreme Court’s determination in [Atkins ], wherein the court held the Eighth Amendment prohibits the execution of mentally retarded *332 offenders. Finally, on October 11, 2007, appointed counsel filed a lengthy Motion to Quash the state’s notice to seek the death penalty, claiming the defendant is mentally retarded. On February 26, 2007, the district court granted the defense’s Motion to Determine Defendant's Competency, and after a hearing on August 30, 2007, the court found he was competent to proceed. The district court also granted the defense’s Motion to Determine Defendant’s I.Q. but declined to resolve the Atkins claim pre-trial, because the parties did not agree to leave this determination up to the court pursuant to La.C.Cr.P. 905.5.1, which states, "The jury shall try the issue of mental retardation of a capital defendant during the capital sentencing hearing unless the state and the defendant agree that the issue is to be tried by the judge.”
Bell, 09-0199, p. 2, 53 So.3d at 439-40.

. While Dr. Hoppe’s contemporaneous assessment of relator’s courtroom performance was written in response to relator’s Atkins claim, rather than his current claims of mental illness and brain abnormality, the doctor's description of relator's courtroom performance remains pertinent.

. The report also notes a "partly empty sella;” the area of the brain in which the pituitary gland is located.

. Because there is no indication that Dr. Woods observed relator at trial, it is unclear how he formed his opinion that relator's performance was poor.

. Likewise, relator shows no district court error in its dismissal of his argument that appointed counsel's failure to discover and introduce this information before he waived representation constitutes ineffective assistance, or in its rejection of his claim that, although he was 25 years old when he committed the offenses, Atkins and/or Roper v. Simmons, 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005) prohibit his execution, because his mental illnesses and brain damage "functionally impair him to the level of a person under 18 years of age.” This Court rejected a similar argument seeking to extend the rationales of Roper and Atkins to adults *334 who display immature developmental characteristics, in State v. Tucker, 13-1631, p. 52 (La. 9/1/15), 181 So.3d 590, and we see no reason to depart from this reasoning in relator’s case,

. Separately, relator contends these evaluation results should permit him to re-open numerous procedurally-barred claims, including claims related to his decision to waive counsel and decisions made during his self-representation, along with claims that: he was denied access to investigators and experts, the trial court erred by imposing excessive restraints on him during trial without a finding of necessity, he was prevented from seeking assistance from his standby counsel during trial, the trial court erred by denying his motion for a change of venue, and his charging document was defective. These claims were thoroughly addressed on direct review and found meritless.
In addition, claims that the trial court erroneously permitted the state’s DNA expert to present unreliable testimony in response to an impermissible hypothetical from the state, and that the state exercised its peremptory strikes in a discriminatory manner in violation of Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986) were not preserved by contemporaneous objections at trial. La.C.Cr.P. art. 841; La.C.Cr.P. art. 930.4(B).

. Relator contends the prosecution used information from the letters to his detriment, citing the state’s renewal of a motion to perpetuate testimony from the only adult surviv- or, Claudia Brown. However, given that Brown was the sole adult eyewitness and relator was on trial for an incident in which he shot Brown in the head, even absent the informant’s letters, the prosecution was clearly aware that relator might pose a threat to Brown's well-being. As such, the prosecution's decision to perpetuate Brown’s testimony is not clearly attributable to the librarian’s letters.

. In any event, the claims lack merit. Relator asserts the court denied him an opportunity to re-call Claudia Brown the next day, yet the trial transcript shows Brown was available to testify on the day that relator presented his defense, and relator fails to explain why he needed an additional day to re-call an available witness. Relator also argues that "key witness” Joshua Brown would have testified that Erica Bell was "controlling and jealous” and provided information regarding "relator’s state of mind," but was unavailable until the following day. Though relator has offered an unsworn statement from Brown, it does not support relator’s assertion that Brown was prepared to provide beneficial testimony.
Relator also argues that the trial court's evi-dentiary rulings constituted improper commentary on the evidence, in violation of La. C.Cr.P. art. 772. Specifically, the court sustained the state’s objection to relator’s questions about previous conflicts between relator and his wife because the testimony was inadmissible evidence of the victim’s character. See La.C.E. art. 404 (generally prohibiting admission of character evidence to prove a person acted in conformity with her character on a particular occasion). Relator reasons that the ruling effectively pre-judged the merits of the case by presuming that Bell was, in fact, a victim as the state contended, rather than the perpetrator, in accordance with his defense theory.
Indulging such a view would produce absurd results. To construe evidentiary rulings as judicial commentary on the merits of either party's theory is to disregard the trial court’s fundamental role as a neutral arbiter. Necessarily encompassed in that role is the discretion to apply the law to govern the proceedings, including the application of the evidentiary rules. Cf. La.C.Cr.P. art. 17 ("[A trial court] has the duty to require that criminal proceedings shall be conducted with dignity and in an orderly and expeditious manner and to so control the proceedings that justice is done.”). Here, relator was on trial for Bell’s murder; as such, Bell was a victim for purposes of the evidentiary rulings. The court’s ruling on the objections was therefore not, as relator claims, an improper comment on the evidence, but rather a necessary ruling on the objections. Moreover, because relator has failed to show that the court abused its discretion in ruling, he cannot carry his post-conviction burden of proof. La.C.Cr.P. art. 930.2.

. See Faretta v. California, 422 U.S. 806, 834-35, 95 S.Ct. 2525, 2541, 45 L.Ed.2d 562 (1975) (accused who chooses to represent himself may not later complain that his self-representation was inadequate); see also State v. Dupre, 500 So.2d 873, 875 (La. App. 1 Cir. 1986).

. The errors and prejudice that relator attributes to pre-waiver counsel are, at best, conjecture, because it is impossible to determine what counsel would have done, had relator not insisted on representing himself. Notably, pre-waiver counsel investigated the relevant aspects of relator's competence, requested and obtained competence and intelligence evaluations, and obtained statements from relator’s mother, teachers, and employers, pertaining to his history.

. In conjunction with the Atkins defense, counsel presented evidence of relator’s educational struggles and work history, and called three of relator's family members to testify that he struggled in school and with following directions but was a good father and husband, and that he had helped family members financially. Counsel also introduced relator’s academic records, which demonstrated his struggles in school, and called Dr. Zimmerman to testify regarding relator's intellectual ability.

. Although relator argues that penalty phase counsel erred by failing to present additional evidence, counsel appears to have reasonably concluded that no other evidence supported the Atkins defense. Much of what relator now presents shows, contrary to his claims of intellectual disability and "severe brain damage,” that relator earned promotions at work and was generally a capable employee. Thus, he fails to show the omitted evidence would have resulted in a different sentencing outcome, especially in a case in which, because he chose to represent himself during the guilt phase, jurors observed Iris abilities and demeanor firsthand.
Relator also alleges counsel erred by failing to raise various objections during the penalty phase, regarding underlying issues that were addressed on appeal, including the admission of relator's phone calls from prison, religious references, and victim impact testimony. Relator shows no basis to revisit these issues, La.C.Cr.P. art, 930.4, and he fails to show the district court erred in rejecting those claims.

, The district court correctly rejected relator’s remaining complaints about penalty phase counsel. Counsel did not err by failing to object to Dr. Hoppe's testimony as an expert witness for the state, on the ground that Dr. Hoppe did not advise relator that the results of his evaluation would not be kept confidential, because Dr. Hoppe evaluated relator pursuant to court order and relator therefore harbored no reasonable expectation of privacy. No provider-patient privilege exists when "the communication was made in the course of an examination ordered by the court in a criminal case to determine the health condition of a patient, provided that a copy of the order was served on the patient prior to the communication.” See State v. Brogdon, 457 So.2d 616, 627-28 (La. 1984) (doctor-patient privilege not intended to apply to information or opinion genuinely relevant to the narrow issue of the defendant's mental health or condition when tendered as an issue either at trial or at the penalty phase).