Judgment rendered November 20, 2024.
Application for rehearing may be filed
within the delay allowed by Art. 922,
La. C. Cr. P.

No. 55,957-KA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

STATE OF LOUISIANA                          Appellee

Versus

TYSON CORNELISON                            Appellant

* * * * *

Appealed from the
Fourth Judicial District Court for the
Parish of Morehouse, Louisiana
Trial Court No. 2020F408

Honorable Bernard Scott Leehy, Judge

* * * * *

LOUISIANA APPELLATE PROJECT          Counsel for Appellant
By: Douglas Lee Harville

TYSON CORNELISON                     Pro Se

ROBERT STEPHEN TEW                   Counsel for Appellee
District Attorney

JOHN GATES SPIRES
SEAN ALBERT SOUTHERN
Assistant District Attorneys

* * * * *

Before COX, STEPHENS, and MARCOTTE, JJ.

**STEPHENS, J.**

This criminal appeal arises out of the Fourth Judicial District Court, Parish of Morehouse, State of Louisiana, the Honorable Scott Leehy, Judge, presiding. Following a bench trial, the trial judge acquitted the defendant, Tyson Cornelison, of aggravated arson and simple criminal property damage, and convicted him of arson with intent to defraud, conspiracy to commit arson with intent to defraud, and injury by arson in connection with a structure fire in the Bastrop town square on April 15, 2020. The trial court sentenced Cornelison to four years of imprisonment on the arson with intent to defraud conviction, two years of imprisonment on the conspiracy to commit arson with intent to defraud conviction, and 12 years of imprisonment on the injury by arson conviction, with the sentences to be served concurrently. Cornelison made a timely motion for appeal, which was granted by the trial court. The only issue raised by Cornelison in his appeal is that the trial court erred in allowing him to waive his right to appointed counsel and represent himself. For the reasons set forth below, we affirm the defendant's convictions and sentences.

**PROCEDURAL HISTORY/FACTS**

*Procedural History*

Three bills of information (one original, two amending) were filed charging Tyson Cornelison in connection with the fire. First, on August 3, 2020, he was charged with one count of simple arson, a violation of La. R.S. 14:52. Thereafter, on March 16, 2021, an amended bill of information was filed, charging Cornelison with one count of aggravated arson, a violation of La. R.S. 14:51, and two counts of simple criminal damage to property, violations of La. R.S. 14:56.

On February 7, 2022, a third amended bill of information was filed charging Tyson Cornelison with:

COUNT 1—AGGRAVATED ARSON
On or about April 15, 2020,
[defendant did] wilfully and damage, by any explosive substance or the setting fire, the structure located at 113 South Franklin Street, Bastrop, Louisiana, whereby it was foreseeable that human life might be endangered, contrary to the provisions of [La.] R.S. 14:51;

COUNT 2—ARSON WITH INTENT TO DEFRAUD
On or about April 15, 2020,
[defendant did] wilfully and intentionally set fire to, or damage by any explosive substance, the structure at 113 South Franklin [Street], Bastrop, Louisiana, with the intent to defraud, contrary to the provisions of [La.] R.S. 14:53;

COUNT 3—CONSPIRACY TO COMMIT ARSON WITH INTENT TO DEFRAUD
On or about April 15, 2020,
[defendant did] wilfully and intentionally conspire with Derek Cornelison and Othelia Cavazos to set fire to, or damage by any explosive substance, the structure at 113 South Franklin [Street], Bastrop, Louisiana, with the intent to defraud, contrary to the provisions of [La.] R.S. 14:53 and 14:26;

COUNT 4—INJURY BY ARSON
On or about April 15, 2020,
[defendant did] wilfully and intentionally damage, by any explosive substance or by setting fire, the structure or property belonging to another, namely the property of Othelia Cavazoe located at 113 South Franklin [Street], Bastrop, Louisiana, where a firefighter present at the scene and acting in the line of duty was injured as a result of the fire or explosion, contrary to the provisions of [La.] R.S. 14:51.1; and

COUNT 5—SIMPLE CRIMINAL DAMAGE TO PROPERTY
On or about April 15, 2020,
[defendant did] wilfully and intentionally damage the building of Ron Israel, located at 117 South Franklin [Street], Morehouse Parish, Louisiana, without the consent of the said Ron Israel, said damage amounting to a value of greater than $50,000.00, contrary to the provisions of [La.] R.S. 14:56(A) and (B)(3).

On June 23, 2020, Walter M. Caldwell was appointed to represent the defendant, Tyson Cornelison. Thereafter, when Attorney Caldwell left the

Indigent Defenders' Board ("IDB") on January 12, 2021, Darrell Oliveaux was appointed to represent Cornelison. Darren Adams, also represented by Attorney Oliveaux, sent a letter to the District Attorney's office, claiming to have information on the fire in the Bastrop town square he had obtained from Cornelison.[1] At that time, the State filed a "Motion for Hearing on Conflict of Defense Counsel," which was set for a hearing on February 7, 2022.

At this hearing, Cornelison was advised that his appointed counsel also represented a potential witness, Darren Adams. Cornelison was advised by the trial court of his right to have conflict-free counsel appointed, and the implications that his waiver of this right might have on appellate or post-conviction relief he may seek in the future. Nonetheless, Cornelison informed the trial court that he wanted to waive the conflict and proceed with Attorney Oliveaux.

Cornelison then filed a waiver of his right to jury trial, which the State initially objected to before withdrawing its objection. A hearing on Cornelison's motion to waive jury trial was held on September 8, 2022. Thereafter, Cornelison filed 13 *pro se* motions notwithstanding his ongoing representation by Attorney Oliveaux. One such motion was a request to be appointed as his own co-counsel, which the trial court denied. Thereafter,

---

[1] At trial, Adams testified that Cornelison admitted setting the building on fire. The reason was so $500,000 in insurance proceeds could be collected by Ms. Cavazos, who was allegedly married to Cornelison's brother Derek. According to Adams, Cornelison was given a blue Ford truck and $50,000 for setting the fire. Adams testified that Cornelison started the fire in a utility closet by "short-circuiting" the lithium battery of an electric vacuum cleaner.

Cornelison moved to relieve appointed counsel and represent himself, which the trial court allowed following a hearing.[2]

A bench trial was held on June 13 and 15, 2023. The trial court acquitted Cornelison of Counts 1 and 5, but convicted him of arson with intent to defraud, conspiracy to commit arson with the intent to defraud, and injury by arson. Motions for post-verdict judgment of acquittal and new trial filed by Cornelison were denied by the trial court, and thereafter, the trial court sentenced the defendant to four years of imprisonment on the arson with intent to defraud conviction, two years of imprisonment on the conspiracy to commit arson with intent to defraud conviction, and 12 years of imprisonment on the injury by arson conviction, with the sentences to be served concurrently. This appeal ensued.

*Facts*

On April 15, 2020, Investigator Jeremy Defee of the Bastrop Fire Department requested the assistance of the Office of the State Fire Marshal in determining the cause and origin of a structure fire at 113 South Franklin Street in Bastrop, Louisiana. The fire department received the call earlier that morning at 6:02 a.m., and by the time firefighters arrived, flames were venting through the structure's roof. Investigator David Shidiskis of the Fire Marshal's Office testified that the downstairs of 113 South Franklin Street was split into two units for commercial use, and the upstairs was for residential use. After walking around the building's exterior and speaking with the responding firefighters, Inv. Shidiskis began his investigation of the

---

[2] Actually, while the trial court did relieve Attorney Oliveaux as counsel of record, the trial court then ordered him to remain available to Cornelison at trial to answer any questions he might have.

interior of 113 South Franklin Street.  He noted that the bottom floor had received water damage only.  As he made his way up the stairs, he could see heat and smoke damage, which became more pronounced as he approached the rear of the building.  The area with the most damage was the workout room, which he concluded was the area of the fire's origin.  According to Inv. Shidiskis, there was charring in the workout room all the way down to and including the floor.  He was unable to find any competent ignition source or accelerant to indicate what had caused the fire.

Having noticed a surveillance camera on an adjacent building on his perimeter walk-around, Inv. Shidiskis had the owner, Steve Perry of KWL Properties, provide him with the footage from around the time of the fire. Investigators also had video footage from Constable David Laing's truck from the same time.  Because Laing's wife used to rent a space in the building, Laing "kept an eye on it," and looked over that morning as he was driving by it on his way to go get donuts.  Something caught his eye, so Laing pulled over; he saw a truck in the rear of the building that he identified as a blue Ford Raptor F-150, which investigators learned was the make and model of a vehicle allegedly owned by the owners of 113 South Franklin Street.  Investigators viewed both videos, which showed a blue Ford Raptor pulling up to 113 South Franklin Street at 4:43 a.m. and a man exiting wearing what appeared to be gloves.  The man looked through the fence, then disappeared to the right out of camera view.  At 5:20 a.m. the man is seen exiting through the gate, getting back into the blue Ford Raptor, and leaving the property.

Inv. Shidiskis spoke with the owners of the building by telephone.[3] Olivia Cavazos and her partner, Derek Cornelison, were in Hawaii on business, having flown there on February 7, 2020. According to Ms. Cavazos, they had been planning to return to Bastrop, but the Coronavirus pandemic had delayed them. Ms. Cavazos told Inv. Shidiskis that she and her husband Derek had a blue Ford Raptor which they had left secured behind the fence behind the building. They had sold the truck to her brother-in-law Tyson Cornelison although no money or paperwork had changed hands. Tyson had picked the Raptor up in March. At that point, Tyson Cornelison became a person of interest with whom the investigators wanted to speak.

With the license plate number from the blue Ford F-150, investigators did a license plate reader search which showed that the vehicle traveled from Louisiana to Clinton, Mississippi, on the day of the fire. On April 20, 2020, a Carfax report showed that the Raptor had gotten an oil change in Oklahoma City, Oklahoma. Investigators contacted Oklahoma State Police and troopers viewed video footage from a Take 5 Oil Change which showed the blue truck getting an oil change and a white male the troopers positively identified as Tyson Cornelison. He also matched the description of the male subject seen on the video footage from South Franklin Street in Bastrop around the time of the fire. An arrest warrant was issued for Cornelison for simple arson. On May 21, 2020, a license plate reader search showed that the blue Ford Raptor was near Junction City, Kansas. Junction City Police

---

[3] After Inv. Shidiskis' initial interview with the couple, law enforcement officials had not been able to get in touch with the owners of the building until the week of the defendant's preliminary examination, held on May 4, 2021, when the couple contacted them to find out the "status" of the investigation.

6

were contacted, and they located the truck at a local Starbucks. Cornelison, confirmed to be the sole occupant of the vehicle, was taken into custody.

At trial, Darren Adams testified that in June 2020, he was a "resident" of the Madison Parish jail at the same time as Derek Cornelison. When asked if the two were cellmates, Adams noted that there are not individual cells, but one big "dorm" room with bunks; he and Cornelison had beds next to each other at some point. They played cards together and talked sometimes. After having "vague" conversations about insurance, Cornelison, who was "an insurance adjuster or something," began talking about the building in Bastrop that had burned. Prior to that, Adams hadn't heard anything about the fire since he had been locked up "for a while." The reason for the fire was so $500,000 in insurance proceeds could be collected by Ms. Cavazos, who was married to Cornelison's brother Derek. Adams testified that Cornelison told him he started the fire in a utility closet by "short-circuiting" the lithium battery of an electric vacuum cleaner. According to Cornelison, his brother was giving him a Ford truck and $50,000 for setting the fire.[4] Adams wrote a letter to the district attorney with this information in it; the D.A. forwarded a copy of the letter to the officers investigating the fire.

Lieutenant Jason Armstrong with the State Fire Marshal's Office testified that he and his K-9 were called in to investigate the fire at 113 South Franklin Street. The K-9, who is trained specifically to identify

---

[4] On cross-examination, Adams stated that he told investigators that Cornelison offered him $1,000 if he could find someone to retrieve from "property" [the sheriff's custody] his phone, which Cornelison had told him communicated with another phone in Colorado. Adams also told investigators his "opinion" that together those phones probably had "a lot of incriminating evidence on there."

ignitable liquids, did not find anything.  However, Lt. Armstrong also communicated with Baton Rouge regarding locating the blue Ford truck, went to Junction City for the extradition once the defendant was located, and spoke to Adams, the writer of the letter to the D.A.

Lt. Armstrong testified that he found Adams to be credible, as there were several things in the letter that someone not involved in the case should not know, such as the location of the fire in the building, the amount of insurance on the building, and the blue Ford truck at the scene, as none of that information had been made public.  Adams' letter also firmed up in Lt. Armstrong's mind the area of origin and the "how" of the fire.  While they did not find the battery, due to the amount of damage and the floor in that area being burned away, lithium batteries are becoming a major deal in fire investigations.  Lt. Armstrong stated that he has had some training regarding lithium battery fires.  He explained that what happens is that the damaging of the cells in a lithium battery causes a thermal runaway to overheat and produce a very intense fire.  The larger the battery, the more water it takes to put out the resultant fire.  Investigators were unable to locate the blue Ford F-150.  Junction City officers had it towed from the Starbucks, and someone came to the towing yard to pick it up.  No one has been able to find it since.  On cross-examination, Lt. Armstrong also stated that the phone Cornelison had on him when he was extradited from Junction City, Kansas, disappeared before fire investigators could get any data from it after it was checked into "property" at the Madison Parish jail.

Barry Mitchell, owner of Southern General Agency, testified that he wrote a commercial general liability insurance policy on the property at 113 South Franklin Street in Bastrop, Louisiana, with limits of $500,000.  The

policy holder's name was Othelia Cavazos, and the coverage date was December 23, 2019, through December 23, 2020.

Chief Timothy Williams of the Bastrop Fire Dept. testified that the call reporting the fire at 113 South Franklin Street came in right after shift change, around 6:02 a.m., on April 15, 2020. This was a big fire, and it had the potential to burn down one side of the town square. There were 11 units that responded, and from the time of the call until the fire was extinguished, it took approximately four hours for them to extinguish the fire. Assistant Chief Damon Carroll received injuries while fighting the fire that morning.

Assistant Chief Carroll testified that he received burns to one side of his face while fighting the fire on the roof of the building at 113 South Franklin Street. Because he had Silvadene at home, he did not go to the hospital, but instead treated the burn without seeking medical treatment from a doctor.

Thereafter, the State rested its case. After the trial court granted an acquittal on two of the five charges with which the defendant was charged, Cornelison made several other motions that were considered and denied by the trial court. Closing arguments were made, and the trial court found beyond a reasonable doubt that Cornelison was guilty of Counts 2, 3, and 4. The court then ordered a presentence investigation report and set the sentencing hearing for September 26, 2023.

At the sentencing hearing, the trial court stated that, after considering the facts in this case, the strength of the evidence, and the contents of the presentence investigation, as well as the sentencing guidelines in Article 894.1, it was imposing the following sentences upon Cornelison: four years' imprisonment at hard labor with credit for time served on the arson with

9

intent to defraud conviction; two years' imprisonment at hard labor with credit for time served on the conspiracy to commit arson with the intent to defraud conviction; and 12 years' imprisonment at hard labor with the first two years being without the benefit of parole, probation, or suspension of sentence with credit for time served on the injury by arson conviction, with the sentences to run concurrently. The instant appeal was filed by the defendant's appellate counsel.

The sole issue on appeal is whether the trial court erred in allowing Cornelison to waive appointed counsel and represent himself without ensuring he had the capacity to do both.

## ARGUMENTS OF THE PARTIES

### *Defendant's Argument*

Appellate counsel concedes that the trial court explained to Cornelison some of the disadvantages of proceeding to trial without an attorney. However, stresses counsel, the trial court did not: (1) inquire into the defendant's age, education, ability to comprehend, read and write; (2) verify that he understood the charges against him, the order of trial, and the potential penalty; (3) and determine that he understood the presumption of innocence and his right to testify regardless of his choice to represent himself or have the assistance of counsel. *See*, *State v. Edwards*, 54,055, p. 5 (La. App. 2 Cir. 9/22/21), 327 So. 3d 1079, 1083.

Because the record does not show that the trial court ensured Cornelison had the capacity to waive his right to appointed counsel, and that he had the capacity to represent himself, and/or that he understood the importance of waiving his right to be represented by an attorney, appellate

10

counsel contends that this Court should reverse the defendant's convictions, vacate his sentences, and remand the matter for further proceedings.

***The State's Argument***

The State argues that there is no merit to Cornelison's assignment of error. It points out that on three separate occasions, Cornelison was told of and waived his constitutional rights. First, when a potential conflict arose as to his court-appointed attorney and that attorney's representation of the witness to whom Cornelison allegedly confessed his role in the arson for money scheme, the trial court went over Cornelison's rights, and the defendant made a "willing and informed" decision to waive conflict-free counsel.

Second, at the hearing on Cornelison's motion to waive jury trial, the trial court made an inquiry into the defendant's level of education and was told that he went to college. The trial court further asked Cornelison whether he was "taking anything" or had any mental or physical condition which would prevent him from understanding the nature of the proceedings. Cornelison answered the judge's questions, then freely and voluntarily waived his right to a jury trial.

The State next points out that Cornelison filed a number of *pro se* motions with the trial court, which further indicated his understanding of the legal process. The third time that Cornelison chose to intelligently and knowingly waive his rights was at the hearing on his motion to waive counsel and represent himself. At that hearing, the trial court asked the defendant whether he understood that there were disadvantages and dangers of proceeding as his own counsel, further indicating that Cornelison would not have his attorney's years of experience and knowledge of the Code of

11

Criminal Procedure or Code of Evidence, which might prejudice him not just at trial but in the future in appellate and post-conviction relief filings. Also at this hearing, Cornelison's appointed counsel told the trial court that he felt that the defendant could adequately defend himself based on their interactions as well as the *pro se* motions he had filed.

The State insists that the trial court in this case ensured that Cornelison made a knowing, voluntary, and intelligent decision to waive counsel and represent himself. Thus, there is no merit to the defendant's assignment of error, and this Court should affirm Cornelison's convictions and sentences.

Both the federal and state constitutions guarantee an accused in a criminal proceeding the right to assistance of counsel. U.S. Constitution amendment VI; Louisiana Constitution art. I, § 13. In *Faretta v. California*, 422 U.S. 806, 95 S. Ct. 2525, 45 L. Ed. 2d 562 (1975), the Supreme Court recognized a defendant's Sixth Amendment right to conduct his own defense by making a knowing and voluntary waiver of his right to counsel and thereby asserting his right to represent himself. Assertion of that right "must also be clear and unequivocal." *State v. Mathieu*, 10-2421, p. 6 (La. 7/01/11), 68 So. 3d 1015, 1018; *State v. Bell*, 09-0199, p. 17 (La. 11/30/10), 53 So. 3d 437, 448, *writ denied*, 564 U.S. 1025, 131 S. Ct. 3035, 180 L. Ed. 2d 856 (2011) (citing *State v. Hegwood*, 345 So. 2d 1179, 1181-82 (La. 1977)).

A trial court has the discretion to appoint a standby counsel to aid the accused if and when the accused requests help, and to be available to represent him in the event that termination of the defendant's self-representation is necessary. *Faretta*, 422 U.S. at 834, n. 46, 95 S. Ct. at

2541, *State v. Mathieu*, *supra*; *State v. Bell*, *supra*.  In the instant case, this is exactly what the trial judge did.

At the beginning of trial, the following exchange between the prosecutor, trial court, and appointed counsel took place:

| | |
|---|---|
| MR. SOUTHERN: | Mr. Cornelison is present representing himself.  Mr. Oliveaux I see is seated as ***advisory counsel***.<br>Is that correct, Mr. Oliveaux? |
| MR. OLIVEAUX: | Well, I think, I don't know the proper term for it.  I think the judge had ruled that Mr. Cornelison could represent himself ***but the judge had extended my appointment to be here if Mr. Cornelison had a question***— |
| THE COURT: | Correct. |
| MR. OLIVEAUX: | ***—that I could answer for him***. |
| THE COURT: | That's right. |

The minutes show that on April 6, 2023, the trial court held a hearing on, *inter alia*, Cornelison's motion for self-representation and to withdraw appointment of counsel.  While both motions were granted by the trial court, Attorney Oliveaux was ordered to remain available throughout trial to Cornelison to answer any legal questions.

"If it looks like a duck, walks like a duck, and quacks like a duck, then it just may be a duck."  Clearly Attorney Oliveaux's role was that of standby counsel in this case, notwithstanding the fact that he was not "officially" designated as such.

The minutes from the trial reflect that Attorney Oliveaux was in fact present in court with Cornelison "for questions," "for defendant's questions," and "as standby counsel" through trial and sentencing until the

13

trial court's appointment of the Louisiana Appellate Project for the handling of the instant appeal.

The record itself shows that Attorney Oliveaux was consulted and utilized by Cornelison at several points during trial. At the conclusion of the State's case, Cornelison made a motion for a partial judgment of acquittal as to Count 1, aggravated arson. According to the defendant, the State failed to present any evidence that it was foreseeable that a human being would be present at the time of the fire's commencement. He also presented the trial court with case law in support thereof. The State made an argument in opposition, and the trial court took a brief recess to consider the motion. Thereafter, the trial court granted the motion and acquitted Cornelison of aggravated arson, then noted that arson as a responsive verdict "still remain[ed] on the table." After consulting with Attorney Oliveaux, Cornelison called the trial court's attention to another case and pointed out that since the State failed to include the words "belonging to another" and "with damage amounting to $ (blank) dollars" in the indictment, arson was not properly a responsive verdict. The trial court agreed and acquitted Cornelison of arson as well.

Cornelison's motions for acquittal as to Counts 2, 3, and 4 were denied by the trial court, which pointed out that each count, although it arose out of the same transaction and occurrence, alleged a separate and stand-alone charge, tracked the law of each statutory provision verbatim, and as to each crime, the State put on evidence sufficient to withstand the motion. Finally, Cornelison requested a partial judgment of acquittal as to Count 5, urging that the State failed to present any evidence that he caused any damage to the building by means *other than* by fire or explosion as required

14

by La. R.S. 14:55. The trial court agreed and acquitted Cornelison as to Count 5. At that point, Cornelison told the court he needed a minute to "speak with my counsel." Several other motions were made by Cornelison and denied by the trial court before closing arguments. Attorney Oliveaux continued his role as standby counsel through sentencing, at which point the Louisiana Appellate Project was appointed to represent Cornelison.

At no point in this matter was this defendant without the ***assistance*** of counsel. In fact, as pointed out by the State, defendant began filing motions without any help from (or apparently the knowledge of) his appointed counsel on January 23, 2023. However, after April 6, 2023, Cornelison began acting as his own counsel, with his former court-appointed attorney transitioning to the role of standby counsel during trial (through sentencing) to "explain and enforce basic rules of courtroom protocol or assist [him] in overcoming routine obstacles that stand in the way of the defendant's achievement of his own clearly indicated goals." *McKaskle v. Wiggins*, 465 U.S. 168, 183, 104 S. Ct. 944, 954, 79 L. Ed. 2d 122 (1984); *State v. Mathieu*, 10-2421, p. 8, 68 So. 3d at 1019. As noted by this Court in *State v. Conner*, 49,351, p. 9 (La. App. 2 Cir. 11/19/14), 152 So. 3d 209, 216, a proper *Faretta* inquiry is required to permit a defendant to proceed with *pro se* representation with the assistance of standby counsel.[5]

---

[5] A criminal defendant does not have the constitutional right to act both as "represented and representative" due to the potential for disruption of the trial process. *State v. Brown*, 03-897, p. 30 (La. 4/12/05), 907 So. 2d 1, 22, *cert. denied*, 547 U.S. 1022, 126 S. Ct. 1569, 164 L. Ed. 2d 305 (2006), citing *State v. Bodley*, 394 So. 2d 584, 593 (La. 1981). *See also*, *State v. Boettcher*, 338 So. 2d 1356 (La. 1976). A district court, however, has the discretion to appoint an attorney to assist a *pro se* defendant; this is standby counsel. *State v. Manuel*, 17-1145, p. 3 (La. App. 3 Cir. 5/2/18), 247 So. 3d 766, 768. When the trial court allows this kind of arrangement, the defendant acts as his only legal representative. "Hybrid" representation allows a defendant the right to defend himself as co-counsel, while standby counsel is an attorney who explains and enforces basic courtroom rules but does not participate to the extent that it would undermine the defendant's appearance of self-representation before a jury. *State v. Brown*, 03-897, p.

Although no minimum requirements have been established for judging the sufficiency of a waiver of counsel, there must be a sufficient inquiry to establish on the record a knowing and intelligent waiver under the overall circumstances. *See State v. Strain*, 585 So. 2d 540, 542 (La. 1991). Whether a defendant has knowingly, intelligently, and unequivocally asserted the right to self-representation must be determined on a case-by-case basis, considering the facts and circumstances of each case, which includes the background, experience, and conduct of the accused. *State v. Bell*, *supra*; *State v. Edwards*, *supra*. While a specific inquiry by the judge expressly addressing the disadvantages of self-representation is clearly preferable, the critical issue on review of the waiver is whether the defendant understood the waiver. *State v. Strain*, 585 So. 2d at 543.

Because there are no inflexible criteria or a magic word formula for determining the validity of a defendant's waiver of the right to counsel, the inquiry into the validity of the waiver must take into account the totality of the circumstances in each case. *State v. Stevison*, 97-3122 (La. 10/30/98), 721 So. 2d 843, 845; *State v. Strain*, *supra*. There must be a showing of clear abuse of discretion for a trial court's ruling on a defendant's right to counsel to be upset, as the trial court has the opportunity to observe the defendant in court appearances and become familiar with the defendant. *State v. Holley*, 53,405, p. 12 (La. App. 2 Cir. 4/22/20), 297 So. 3d 180, 188.

This record supports the trial court's determination that the defendant was fully capable of making a knowing, intelligent, and unequivocal choice

---

29, 907 So. 2d at 22. When the trial court's appointed legal counsel serves only in an advisory role, the accused is abandoning his right to be represented by counsel; at the same time he is exercising his right to self-representation. *State v. Manuel*, *supra*. Therefore, when an attorney is appointed as an advisor or standby counsel, the accused must knowingly waive his right to be represented by counsel. *Id.*

16

to waive counsel and represent himself knowingly, intelligently, and unequivocally, notwithstanding the fact that there was no formal *Faretta* "question and answer" type colloquy. Although a defendant need not himself have the skill and experience of a lawyer in order to competently and intelligently choose self-representation, he should be made aware of the dangers and disadvantages of self-representation so that the record establishes that "he knows what he is doing and his choice is made with eyes open." *Faretta*, 422 U.S. at 835, 95 S. Ct. at 2541, citing *Adams v. United States*, 317 U.S. 269, 279, 63 S. Ct. 236, 242, 87 L. Ed. 268 (1942).

The trial court got to know Cornelison through the numerous *pro se* motions he filed before, during, and after trial and his arguments at the hearings on these motions, which sought the trial court's ruling or intervention on such issues as the defendant's: waiver of the right to jury trial; right to further discovery from the State; request to serve as co-counsel; entitlement to a preliminary examination on newly added charges; denial of access to his legal mail and limitations on use of court-approved documents for drafting his pleadings while in the parish jail; right to a speedy trial; right to withdraw appointment of counsel and for self-representation; and requests for severance, acquittal, and new trial. The trial court also engaged with the defendant during hearings on Attorney Oliveaux's motions on the issue of conflict of counsel and waiver of jury trial, and at the trial itself, where Cornelison **was** his own counsel.

At several of the hearings, the trial court specifically questioned Cornelison as to his capacity, as noted by the State. At the hearing on the motion to determine whether a conflict existed on February 7, 2022, Attorney Oliveaux stated that he was appointed to represent both Cornelison

17

and the confidential informant, Darren Adams, in December 2020. On December 28, 2020, Adams sent the district attorney a letter informing him that he had information about Cornelison's case. Atty. Oliveaux stated that he learned of the existence of Adams' letter in early 2021 and informed the IDB several times about the potential conflict. He was relieved of his appointment as Adams' attorney on January 11, 2022. The trial court informed Cornelison of the situation and advised him of his right to conflict-free representation. The trial court asked the defendant whether he wanted to continue with Attorney Oliveaux by waiving the conflict or have another attorney appointed. The court specifically stated that if Cornelison waived the conflict, he could not come back later on appeal or post-conviction relief and claim ineffective assistance or prejudice because of the conflict. Cornelison's response was, "I'm making a willing and informed decision. I'd like to keep Mr. Oliveaux as my counsel."

At a motions hearing on April 19, 2022, Cornelison made an oral motion to appoint Atty. Oliveaux as co-counsel in his defense. The reason the defendant gave was that the joinder of offenses (after the second amending bill of information) was causing him and Attorney Oliveaux to have "separate ways" to handle the trial strategies of his defense. The trial court pointed out to Cornelison that this was the very reason it could not allow him to serve as co-counsel with his court-appointed attorney—their difference of opinions as to trial strategies put Attorney Oliveaux in an impossible position in a co-counsel role.

The solution in such a situation, noted the trial court, was that the defendant could represent himself, hire his own counsel, or assist his counsel as long as Cornelison understands his attorney would be the one making

strategic decisions based on his knowledge, experience, and training.

Cornelison explained to the trial court that he and his attorney had discussed

this, as well as the option of waiving a trial by jury, and he wished to waive

his right to trial by jury. Atty. Oliveaux then informed the trial court that the

defendant had decided to waive jury trial and be tried by the court, against

the advice of counsel.[6]

On May 26, 2022, the trial court confirmed Cornelison's waiver of

conflict; Atty. Oliveaux made an on-the-record statement that he apparently

had never met Adams so there was not even an actual conflict. On

September 6, 2022, the State withdrew its objection to the defendant's

waiver to jury trial, but asked the trial court to make sure Cornelison did so

knowingly and intelligently. During the colloquy, the trial court determined

Cornelison's level of education (allegedly college),[7] lack of physical or

mental conditions or being under the influence of any medication affecting

his ability to understand or make an intelligent decision regarding his right

to trial by jury, his knowledge and understanding of how a trial works and

what a jury trial is, and that he knew the difference between a jury and judge

trial.[8] Both the State and defense counsel were satisfied with the colloquy

and Cornelison was allowed to waive his right to trial by jury.

At the April 6, 2023, hearing on Cornelison's *pro se* motions, the

defendant's motion to withdraw appointment of counsel and for self-

---

[6] The motion to waive trial by jury was filed on April 21, 2022.

[7] This conflicts with the information contained in the defendant's PSI report.

[8] The trial court explained that a trial by judge means that it is only the court that will hear all of the evidence, apply the law to the evidence, and make a decision at the end of the trial as to whether the State has proven his (the defendant's) guilt beyond a reasonable doubt as to each and every element of the crimes with which he has been charged.

19

representation was taken up first. Attorney Oliveaux informed the trial court that he felt that Cornelison's motions demonstrated his understanding of "what he is doing" and that "if I've ever had an IDB client that is capable of representing himself it would probably be Mr. Cornelison." Both the State and trial court agreed with this sentiment.[9] The trial court and Cornelison had the following exchange:

TRIAL COURT: Mr. Oliveaux has indicated that if anybody that he's dealt with in the past is capable of self-representation, you're the one. But you do understand that you have the right to counsel, and Mr. Oliveaux has been appointed to represent you, and he's a trained attorney. He's got a law degree, and he's got years of experience in handling criminal cases, and that he would be able to use that training to represent you and to identify any defenses you may have, to assert those defenses at trial, subpoena witnesses, interview witnesses, potential witnesses, and to understand the procedures at trial and to properly file motions that may be appropriate and to cross-examine any witnesses called against you by the State. And by representing yourself you're losing that benefit … There are certain dangers and disadvantages of proceeding without counsel. Because of the fact that your attorney has a formal legal education and experience in dealing with these type cases … he can also understand procedurally and factually whether there might be questions that he needs to ask the witnesses and maybe questions he needs to stay away from that can impact not only the outcome of the case but also any appellate issues you might have that need to be preserved during trial. In other words, if he's sitting there, he understands that maybe the questions asked he knows to object and what evidence that might be admissible and what's not admissible. And if evidence gets in if you're representing yourself because you don't

_____

[9] Something that this Court finds particularly relevant to this analysis the fact that the defendant's case was set for judge, not jury trial.

20

object and you can't come back later before the appellate court and say this shouldn't have come in. . . . Do you understand that you might be waiving the right to counsel and you might be subjected to certain dangers or disadvantages that go along with self-representation, okay, you understand that?

CORNELISON:   I do.

TRIAL COURT:   And you still wish to waive counsel and go forward?

CORNELISON:   I believe that Mr. Oliveaux could benefit me as standby counsel but if it's the choice of me representing myself or being represented by an appointed counsel, I choose to represent myself.

TRIAL COURT:   Apparently, that's a problem because Mr. Oliveaux might not agree to certain things that you do in your trial strategy or your preparation for trial. And he may have to give advice to you that would be contrary to what you think you ought to have. So standby counsel can be tricky for your attorney and for you.

CORNELISON:   *My understanding of standby counsel is [Atty. Oliveaux] would be there to answer any of my legal questions, I'm not asking that we co-counsel.*

TRIAL COURT:   Mr. Oliveaux, are you willing to do that?

OLIVEAUX:   I think what [Cornelison] is referring to, judge, I've seen on occasion that the court would allow the defendant to represent themselves, "relieve" counsel of that responsibility, except [for them to] be there at the trial of the matter to address a question if a question arose on Mr. Cornelison's behalf. I think that's what he's referring to.

TRIAL COURT:   Is that correct?

CORNELISON:   *Well, he would also address any legal questions that I have at any stage of this proceeding, not just at trial.*

21

STATE ATTY.:     Your Honor, Mr. Cornelison is asking to represent himself. I believe he either has to make a choice, either he goes it by himself or he represents himself and he takes on the burden of an attorney or he continues the representation with Mr. Oliveaux.

TRIAL COURT:     You want to waive your right to counsel?

CORNELISON:      I do, your honor.

Thereafter, the trial court relieved Atty. Oliveaux from his role as court-appointed counsel, then reappointed him as standby counsel for Cornelison, who, as noted in the above exchange, succinctly and intelligently showed his knowledge of the very nuanced distinction between co-counsel/hybrid representation and standby counsel to both attorneys and the trial court. Following a brief discussion of a few other pending *pro se* motions, the trial court found that Cornelison had freely and voluntarily waived his right to counsel and granted his motion to waive counsel and for self-representation.

This record makes it patently obvious that it was the defendant himself who knowingly, voluntarily, and emphatically chose the arrangement which put him at the helm of his own defense in a trial by judge, with his former attorney ready to assist him in the role of standby counsel.

Under the facts and circumstances of this case, we find no error in the trial court's determination that the defendant knowingly, intelligently, and voluntarily waived his right to counsel and chose to exercise his right to self-representation.

22

## CONCLUSION

For the reasons set forth above, we affirm the convictions and sentences of the defendant, Tyson Cornelison.

**AFFIRMED.**